# UNITED STATES

v.

**Staff Sergeant Clyde E.L. MANSFIELD, FR048–44–1263, United States Air Force.**

**ACM 24758 (reh).**

U.S. Air Force Court of Military Review.

Sentence Adjudged 9 Dec. 1987.

Decided 21 Nov. 1991.

Appellate Counsel for the Appellant: Major Paul M. Dankovich (argued), Colonel Richard F. O'Hair, and Colonel Jeffrey R. Owens.

Appellate Counsel for the United States: Lieutenant Colonel Brenda J. Hollis (argued), Colonel Joe R. Lamport, Colonel Robert E. Giovagnoni, Major Paul H. Blackwell, Jr., Major Morris D. Davis, Major Terry M. Petrie, and Captain James C. Sinwell.

Before MURDOCK, HODGSON and LEONARD, Appellate Military Judges.

## OPINION OF THE COURT
## UPON REHEARING

HODGSON, Senior Judge:

On 4 February 1984, the body of Yang Chae–Song was discovered in an alley near the train station in Song–Tan, Korea. Yang had been fatally stabbed in the back. The city of Song–Tan borders the west side of Osan Air Base, a major American military installation. The appellant, Staff Sergeant Clyde Mansfield, was convicted of Yang's premeditated murder in November 1984 and sentenced to life imprisonment and accessory punishments. On appellant's initial appeal we concluded he had been denied effective assistance of counsel,

set aside the findings of guilty and the sentence, and authorized a rehearing. *United States v. Mansfield*, 24 M.J. 611 (A.F.C.M.R.1987). At the second trial in December 1987, the appellant was again convicted of premeditated murder and sentenced to life imprisonment in addition to lesser penalties.

In March 1991 both sides completed their pleadings, and the 28 assigned errors ripened for consideration and resolution. We find no prejudicial error and affirm.

### FACTS

During the summer of 1983, Mansfield was assigned to Hawes Air Force Station, California, as an electrical power plant technician. While he was not well-liked at the site, as he did not make friends easily, he was considered to be a competent noncommissioned officer. He was described by co-workers and associates as a "perfectionist" who was "meticulous and careful in his approach to problems." Once he decided on a course of action, it was difficult to dissuade him from following through.

The testimony at trial also established that the appellant was attracted to oriental women, and he actively sought their companionship. His first wife was Japanese, but the couple divorced after 10 years. He retained custody of their son.

Technical Sergeant Russell Haney worked with the appellant at Hawes AFS. He was married to a Korean, Un–Cha. Previously, Un–Cha had been married to the murder victim, Yang Chae–Song, but she divorced him and married Haney in 1982. Un–Cha and Yang had two children, Sabina and Michael, who came to the United States with Un–Cha.

Sometime in the late winter or early spring of 1983, the appellant asked Un–Cha to baby-sit his son. She agreed. This acquaintance later developed into a close relationship. The affair was an open secret at Hawes with the appellant speaking candidly of his love for Un–Cha. Haney became aware of the situation but was assured by

Un–Cha that her relationship with Mansfield was not serious.

Myong–Cha Stein is Korean and during June 1983 lived with her husband, Technical Sergeant Richard Stein and their two daughters, Sandra and U–Sok, in an apartment near the train station in Song–Tan. Their landlord, Yang Chae–Song, had Myong–Cha call Un–Cha Haney and tell her that he, Yang, was seriously ill and would like to see his children before he died. This was not true. It was merely a scheme designed to allow Yang to get the children back in his custody. It was successful. Once the children were in Korea, Yang refused to let them return to the United States. Haney and Un–Cha went to Korea to locate them, but could not. Haney returned to the United States, but Un–Cha remained in Korea to continue the search.

Although she returned to the United States much earlier, Haney did not see Un–Cha again until September. There is an indication that Mansfield provided some of the money for the trip to Korea. The situation concerning the children upset Mansfield, and he told a co-worker, that he would "do whatever it took to get the children back." When Un–Cha said she lacked the funds to return to the United States, Mansfield sent her the money.

In July, after Un–Cha returned from Korea, she and Mansfield took a 12–day trip to Alaska to visit her sister, Eun–Hui Bending, whose husband was stationed there. It was apparent to Mrs. Bending that Mansfield was deeply in love with Un–Cha. It was during this period that Un–Cha believed she was in love with Mansfield.

Sometime that summer Un–Cha said she wished to undergo breast enlargement surgery. Mansfield arranged for the procedure and agreed to pay for it. The two consulted a doctor in Las Vegas, Nevada. After being told there would be a 2–week convalescent period, Mansfield rented an apartment in Las Vegas for "Mrs. Un–Cha Mansfield.". On 7 September, while the two were returning to Las Vegas for the operation, Un–Cha, who was driving, lost control of the car. The resulting accident left Un–Cha permanently paralyzed from the waist down. Mansfield suffered only minor injuries.

Sergeant Haney first learned that Un–Cha had returned from Korea and was in the hospital when he received an ambulance bill for his wife in mid-September. When he went to Las Vegas to visit Un–Cha, Mansfield was there. Medical personnel at the hospital, and later at the rehabilitation center, initially thought Mansfield was Un–Cha's husband as he was always there with gifts. Un–Cha, however, was equally affectionate with both her husband and Mansfield.

After Un–Cha returned home to her husband's quarters on Edwards Air Force Base, Mansfield would drive by the Haney residence at all hours and leave notes for her in the bushes surrounding the house and under rocks. He would also hang around Haney's house and yard. This came to a head on 28 November, when a security policeman was summoned and found Mansfield crouched under the Haney's bedroom window. Mansfield told the investigating officer that he and Un–Cha were "good friends" and that he and Haney were "bitter enemies." In his attempt to have Un–Cha leave her husband and marry him, Mansfield had his sister call Un–Cha and pretend to be Haney's girl friend.

It was the consensus of Mansfield's co-workers that the accident deeply affected him. For example, he told all who would listen that he was "in love" with Un–Cha, wanted to marry her, and was responsible for her injuries. He also announced he thought Un–Cha's husband was mistreating her after the accident. It was, however, the "peeping Tom" incident that caused the deepest concern to Mansfield's site chief. The site chief, a senior noncommissioned officer, discussed the episode with Mansfield and ordered him, on 8 December, to refrain from contacting Mrs. Haney while she was married.

On 17 January 1984, the situation between Mansfield and Un–Cha Haney had reached a point that the site chief referred Mansfield to the Edwards Mental Health Clinic for evaluation. On 25 January 1984,

Doctor (Col) Oscar Juarique, a psychiatrist and Chief of Mental Health at Edwards, interviewed Mansfield. He found Mansfield "agreeable, calm, relaxed and not overly depressed." Dr. Juarique concluded that while Mansfield had some problems, he was "fully responsible for ... his actions." At this same general time, Mansfield went to the Edwards Housing Office, said he was going to get married, and that his fiancee was in a wheelchair and had two children. He inquired about modifying base quarters to accommodate her condition.

In early January 1984, Mansfield asked for 30 days leave to go to Korea "to rest and recuperate and to take care of some business [there]." Because of local manning requirements and because he was scheduled to° be assigned to Korea, the leave was denied. Subsequently, Mansfield persuaded his site chief to give him 6 days leave beginning in late January to help his sister in Arizona move. The second leave application was submitted after his assignment to Korea was canceled.

Mansfield began his leave on 28 January. Before he left on leave, his immediate supervisor reminded him that he had to be back for duty on 2 February. A co-worker took him to the Los Angeles International Airport where he enplaned for Kimpo International Airport, Seoul, Korea. He arrived in Korea at approximately 1840, 29 January, Korea time.

Mansfield went from the airport to the Hamilton Hotel in Itaewon, a suburb of Seoul, Korea, where he stayed from 29 January to 3 February. While a guest at the hotel, Mansfield struck up an acquaintance with the hotel manager and a bellman and would go to bars with them. During their conversations, Mansfield displayed a photo of a Korean woman in a wheelchair whom he said was his wife. Mansfield indicated his wife's ex-husband was the cause of her injury, and that he had come to Korea for "revenge." During his stay in Korea a number of phone calls were made between him and Un–Cha and between Un–Cha and the Stein/Yang residence in Song–Tan. He also called Un–

Cha's sister in Alaska, but denied he was in Korea.

On 2 February, the owner of a rice store near the Song–Tan train station testified he saw an American fitting Mansfield's description making a phone call from a booth near his shop. He later identified Mansfield as the person making the call. During this same period, Mansfield made numerous phone calls to the Stein/Yang house asking for Yang. Although Mansfield used various false names, the persons taking the calls recognized the voice as his. Each time he called, Mansfield said he had a letter or package for Yang. During the afternoon of 3 February, Sabina Haney, Un–Cha's 9–year–old daughter, saw Mansfield in an alley near their house, but he acted like he did not know her.

At about 1730 hours, 3 February, Yang answered the phone, looked bewildered, and handed the phone to Technical Sergeant Stein who was standing nearby. The caller, who spoke "very fluent English," told Stein his name was "Sergeant Wilson," and that he had a letter and package for Yang. He suggested that they meet at the Song–Tan Hotel Coffee Shop at 1900 that evening. Yang and Stein went to the hotel which was close by, but found no "Wilson." They both waited about an hour and left. When Stein arrived home early the next morning, Yang was not there. Yo Sum–Cha lives near the Song–Tan train station. At approximately 2115, 3 February, she heard an argument, partially in English, in the alley near her apartment. At the same time, Ho Non–Yi, who also lives nearby heard running footsteps.

Mansfield caught a taxi at the Osan Air Base Main Gate at approximately 2130, 3 February, and had it take him to Seoul. He left Korea at about 1240, 4 February, Korean time, and arrived in Los Angeles at 1130, 4 February, California time. Later on 4 February, there was a disturbance when Mansfield attempted to pass a note to Un–Cha at the Edwards Base Theater. The security police were called, but the note was never found.

Yang's body was found in an alley near his house at approximately 0520, 4 Febru-

ary. He was fully clothed and wearing a leather jacket with a hole in the back. A stainless steel kitchen knife was lying near the body. The crime scene is three-quarters of a mile from the Osan Main Gate and near the Song–Tan Hotel and the train station. The autopsy established the cause of death as a single stab wound in the back which penetrated the ribs and severed the aorta. Death occurred almost immediately. The wound was consistent with the knife found at the scene. The time of death could not be pinpointed, but was probably sometime between 2100 and 2200 hours, 3 February. There were no defensive wounds or injuries to the body, and no signs of a struggle.

Mansfield became a suspect almost immediately upon the discovery of Yang's body. On 4 April, he was arrested at Hawes and questioned. After proper warnings and advice as to the right to counsel, Mansfield acknowledged knowing Un–Cha and stated he loved her. He said he knew her children were the most important thing in her life, and she had told him she would never divorce her husband until she had her children. He admitted calling Un–Cha from Korea, but denied discussing the children during any of the calls.

Mansfield was returned to Korea in mid-April 1984, and placed in pretrial confinement. During this confinement he stated to a fellow prisoner, "I'm in this ... place for killing a ... gook. I mean, they think I killed a ... gook." After his first trial, when asked by co-workers if he had killed Yang, he cryptically replied, "I'm not going to say I did, and wouldn't say I didn't." He indicated that such a response was necessary "because it's not over" and "there's a possibility there will be a round two." There is some evidence that Un–Cha suggested to Mansfield that if her first husband were dead, she would get the children back. Mansfield also indicated to the Korean wife of a co-worker that he was going to Korea to kill Yang so that Un–Cha could get her children back. This woman thought he was serious, and tried to talk him out of it.

Captain Mark *Paris* is the Chief Psychologist, Directorate of Mental Health, United States Disciplinary Barracks, Fort Leavenworth, Kansas. In mid-June 1985, Mansfield told Davis he went to Korea to bring back Un–Cha's children. He said he saw Yang and initially Yang agreed to return the children. The two met in a fairly populated area and then went through some winding streets and ended up in an area with no people around. There was a "verbal altercation." The next thing Mansfield remembered was seeing a man lying on the ground with a knife in him.

During their opening statement at Mansfield's second trial, the defense acknowledged that "although [the appellant] may have been the physical agent of the death of Mr. Yang, there is a serious doubt whether he was responsible [for] that death." The defense stressed that when Mansfield was in the alley with Yang, he was "a man who lacked the ability to conform his conduct to the requirements of the law."

To assist the court members in understanding what caused the appellant to act the way he did on 3 February 1984, the trial defense counsel offered extensive expert testimony from an array of highly qualified witnesses: Doctor John Beck, a psychiatrist with over 23 years experience; Doctor Robert Vosburg, a former Air Force psychiatrist, now in private practice, who was a member of the sanity board that examined Mansfield in 1984; Doctor John Streffling, Chief of Psychiatry at the United States Disciplinary Barracks; and Doctor Michael Coburn, a forensic psychiatrist. While their views regarding specific diagnoses differed, they shared a common view on the forces that made the appellant behave as he did. They all agreed that while Mansfield could appreciate the criminality of his conduct, he lacked the substantial capacity to conform his conduct to the requirements of the law at the time of the offense.

Doctor Beck concluded that the appellant suffered from a Post–Traumatic Stress Disorder (PTSD), an Adjustment Disorder with Mixed Disturbance of Mood and Con-

duct, and a Mixed Personality Disorder which amounted to a mental disease or defect. Beck opined that in the 4 to 8 weeks before Yang's death, Mansfield was "in an altered state of personality function and personal desperation." The car accident of 3 September 1983 was the triggering event, and was a dual trauma: 1) injury to a loved one and 2) rejection of him by her in favor of her husband. The appellant "idealized" his relationship with Un–Cha. He saw her as the "personification" of sweetness and love. He rationalized that if he could get the children back, they could be used as pawns to get Un–Cha to leave her husband. Dr. Beck acknowledged that his diagnosis of the appellant's mental condition does not meet the American Psychiatric Association's (APA) definition of a severe mental disease or defect, but thinks their standard is too narrow and inflexible. In his view a severe mental disease or defect should not be limited to psychoses because other behavior disorders can be just as severe as any behavior compelled by a psychosis.

Doctor Vosburg first saw the appellant in May and June 1984. He was not sure why there had been a psychiatric referral as the appellant was "not flamboyantly psychotic" and "not grossly disturbed." At that time Vosburg found Mansfield oriented to time, place, circumstance, and in contact with reality. Later, he concluded that the appellant suffered from a PTSD behavioral problem. The stressors included the car accident, problems at work, survival guilt as a result of the accident, and memory impairment. The accident triggered a "traumatic neurosis." The appellant's PTSD was described as mild to moderate and he was not psychotic. While he was deeply attracted to Un–Cha and looked upon her as a "mother surrogate," he was not obsessed with her in a clinical sense. *See American Psychiatric Institute, Diagnostic and Statistical Manual for Mental Disorders (DSM)* (3d Ed.1980.) Dr. Vosburg agreed that a PTSD is not service-disqualifying, and that car accidents do not always result in PTSD.

Doctor Streffling has conducted over 6,000 mental examinations. He first saw the appellant in March 1985, when the latter had trouble sleeping and had contemplated suicide. After Streffling conducted two clinical evaluations and reviewed the prior mental health records, he diagnosed the appellant's mental condition as Alcohol Abuse in Remission, and a Mixed Personality Disorder with Paranoid, Schizoid, Schizotypal, Dependency and Obsessive Traits— he ruled out PTSD. He considered malingering as a possibility, but adhered to his opinion that the appellant lacked the substantial capacity to conform his conduct to the requirements of the law at the time of the offense.

Doctor Coburn interviewed the appellant four times—the last being in July, 1987. He found the appellant to be a "very sick" person whom he diagnosed as suffering from PTSD with a Mixed Personality Disorder manifested by Paranoid, Schizoid, Narcissistic, Avoidant, Dependent, and Obsessive-Compulsive traits. The car wreck that resulted in Un–Cha's injury and the earlier death of the appellant's mother were stressors that triggered the impairment which Coburn described as "very, very serious." Coburn acknowledged that the appellant did not have an organic brain disease and was not psychotic, but maintained that his mental condition was a disease or defect which prevented him from conforming his actions to the requirements of the law. Dr. Coburn also thought the APA standard on what amounted to a mental disease or defect was too restrictive. He felt that the impairment should not have to be a psychosis, but merely a serious disorder. The appellant's stressors "snowballed" and, after the accident, he lost interest in everything and everyone but Un–Cha.

In preparation for his first trial, Mansfield wrote a lengthy and detailed account of his relationship with Un–Cha, the events that led up to the meeting with Yang, and what happened at that meeting. The parties at the second trial referred to this statement as the appellant's "life story." The statement told of Mansfield's attempt to hire a "hit man" to kill Yang, his purchase of a knife shortly before the homicide and the manner of its use at the scene.

Both the defense and prosecution used the statement during the direct and cross-examination of the defense's expert witnesses, all of whom had read the statement and with the exception of Dr. Vosburg had considered it in arriving at a diagnosis.

The statement itself was a very difficult document for a psychiatrist to assess as it was a "combination of fact and fiction." Doctor Beck opined that even if the appellant had the knife in his hand when he met Yang, he lacked the ability to control himself. Doctor Vosburg's diagnosis of the appellant's mental state was not changed by his reading of the "life story." Likewise, Doctor Streffling's diagnosis remained the same after he read the statement. Doctor Coburn stated he was aware of the "hit man" theory the first day he met the appellant. He indicated further that the appellant had told him two versions of the events in Korea, but neither was complete or believable. Nothing in the "life story" changed his assessment of the appellant's mental makeup.

In his "life story" the appellant related that he attempted to negotiate the return of Un–Cha's children from Yang by offering him a substantial sum of money. Initially, this offer was considered by Yang, but he changed his mind and started berating Un–Cha. The appellant and Yang argued, a scuffle followed, and the appellant took a knife from a plastic bag which Yang pulled from his hand. According to the appellant what happened next is unclear, but when he saw Yang on the ground, he attempted to remove any incriminating evidence from the scene and left.

The defense sought to show Yang as a violent person, skilled in martial arts, who had assaulted a former boyfriend of Un–Cha's with a knife. A professor of Korean Traditional Culture at the Seoul National University testified that offering money for a man's children is a "shameful thing," and would anger a Korean father. The defense suggested that when Mansfield offered to "buy" Un–Cha's children from Yang this so angered him that he attacked Mansfield who then was forced to defend himself. An instruction on self-defense was given the members prior to findings.

In rebuttal to the testimony just discussed the prosecution responded with three equally distinguished and qualified expert witnesses: Doctor Philip Resnick, a forensic psychiatrist who teaches courses on the detection of deception and faked mental illness; Major (Dr) Paul Sorgi, staff psychiatrist, and Director, Psychiatric Residency Training, Wright–Patterson Air Force Base, Ohio; and Colonel (Dr) Ali Baser, Chairman, Department of Psychiatry, Wiesbaden Regional Medical Center, Wiesbaden, Germany. Doctor Baser has 30 years experience as a psychiatrist.

All three psychiatrists who appeared for the prosecution testified that the appellant did not have PTSD, but at the very most a Mixed Personality Disorder which did not prevent him from conforming his conduct to the requirements of the law. None of these psychiatrists observed any evidence of a major mental illness, e.g., schizophrenia or manic-depressive state, or any indication of a psychosis. All three, using the American Law Institute standard, found the appellant fully responsible for his actions.

Doctor Resnick cited various bases for concluding that the appellant had the capacity to conform his conduct to the requirements of the law and to refrain from stabbing Yang. For example, the appellant did not suffer from command hallucinations and there was no evidence that a delusion, delirium, psychosis or misperception of reality caused the act. Doctor Resnick observed that the appellant "did not act with an uncontrollable urge" and stab Yang in front of the coffee shop where he first met him, but waited until the two were in an isolated area and after Yang had refused to release Un–Cha's children in return for money. The appellant was only "driven" to kill Yang in order to please Un–Cha by getting her children back. In his opinion, the appellant was not an "out of control, quivering person welling up with hate," but a person who could control his actions until a time when he is less likely to be caught. Doctor Resnick ac-

knowledged that Mansfield had an intense love for Un–Cha and spent substantial sums to win her affection, but stated that "being in love is not a mental disease."

Doctor Sorgi was a member of the sanity board that interviewed Mansfield in August 1987. At that time the appellant's behavior was appropriate, speech was in normal limits, and he possessed an above average I.Q. After reviewing the appellant's medical and prior mental evaluations, Doctor Sorgi found no evidence of a mental disease or defect. He concluded that the appellant had a mixed personality disorder, and had the capacity to conform his conduct to the requirements of the law. The basis for this conclusion was much the same as Doctor Resnick's in that Sorgi saw no hallucinations or delusions and no indication of a psychosis.

In September 1984, Doctor Baser was a member of a sanity board that evaluated the appellant. The board's conclusion indicated a mild to moderate Personality Disorder. There was no evidence of PTSD. Doctor Baser pointed out that PTSD usually results in an impairment of the sexual drive, but Mansfield, in his "life story," stated he was sexually active in Korea, and had a "great time." Further, those suffering from PTSD avoid discussions of their traumatic events, however, here the appellant wanted to talk about the accident all the time. In Doctor Baser's opinion, Mansfield had the capacity to conform his conduct to the requirements of the law.

The prosecution also offered lay testimony that Mansfield appeared "normal, rational, and coherent" in his behavior up until his arrest. His mental stability was not questioned. Further, in June 1984, Mansfield told a cellmate he wanted to convince a psychiatrist he was "crazy." To this end he started acting "strange in the latrine" by staring at the walls. After the guard was called, Mansfield looked at his cellmate and "winked."

In closing its rebuttal case, the prosecution offered evidence that Yang was a peaceful, educated person who was not known to carry a knife.

## INEFFECTIVE ASSISTANCE OF COUNSEL

The initial issue we address is one of first impression within the military justice system: Was the appellant denied his Sixth Amendment right to effective representation of counsel in his second trial because of a taint emanating from this Court's reversal of the results of his first trial? *Mansfield,* 24 M.J. 611 (A.F.C.M.R.1987) (*Mansfield I*).

■ The main thrust of appellant's argument is that the prosecution, at his second trial, had access to, and probably used, privileged attorney-client information he was forced to disclose to support the claim of ineffective assistance of counsel at his first trial.

In the appeal following the first trial, the appellant claimed that his trial attorneys had failed to investigate, prepare, or properly present either an insanity or diminished capacity defense. Later, his appellate counsel expanded the issue of ineffective assistance of counsel by suggesting that the trial defense counsel in *Mansfield I* acted improperly and against the appellant's best interests by instructing him to withhold material information from Doctor Coburn, a potential defense insanity defense witness. Both the government and the appellant asked for a limited evidentiary hearing to investigate the claim of ineffective representation. *See generally United States v. DuBay,* 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967). We ordered such a hearing. Our earlier decision in *Mansfield I* discussed the evidence supporting the appellant's allegation of inadequate representation.

■ A military accused is entitled to effective assistance of counsel. This is true whether the counsel is detailed or selected by the accused. *United States v. Scott,* 24 M.J. 186 (C.M.A.1987); *Bates v. Blackburn,* 805 F.2d 569 (5th Cir.1986). Further, where an accused is denied effective representation, he or she is entitled to a new trial. This is the rule in both military and civilian jurisdictions. *United States v. Scott, supra; United States v.*

Mansfield, supra; United States v. Cronic, 839 F.2d 1401 (10th Cir.1988); Martin v. Rose, 744 F.2d 1245 (6th Cir.1984); Morrison v. Kimmelman, 650 F.Supp. 801 (D.C.N.J.1986); State v. Felton, 110 Wis.2d 485, 329 N.W.2d 161 (1983).

The appellant, however, seeks dismissal of the charges as his remedy. Citing Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), he argues that he was "compelled" to waive the attorney-client privilege in order to establish grounds of ineffective assistance of counsel. Thus, he is entitled to a "Kastigar-like" remedy wherein the prosecution has the affirmative duty to prove that the evidence it wishes to use at the second trial was derived from a legitimate source wholly independent of the "compelled" testimony relating to his claim of inadequate representation. He contends, without this protection, "... [a] retrial becomes nothing more than a forum whereby the government perfects its case at the expense of the appellant's Sixth Amendment right to effective assistance of counsel." This assertion misses the mark. While the appellant's self-interest may "compel" him to claim that his lawyer was inept, this "compulsion" does not allow him to re-claim his attorney-client privilege. An attack on an attorney's competence waives the attorney-client privilege as to matters reasonably related to the claim of inadequate representation. United States v. Johnson, 21 M.J. 211 (C.M.A.1986); United States v. Caudill, 18 M.J. 514 (A.F.C.M.R.1984); see also Mil.R.Evid. 502(d)(3).

■ Appellant's counsel maintain that "[t]he unique circumstances of this case have conspired to produce a situation wherein he can never receive a fair trial." They postulate that the appellant can never be restored to the position he occupied before the ineffective representation. They argue that the evidentiary hearing which provided the basis for granting a new trial gave the prosecution unfair access to facts and potential defenses that the appellant might raise at the rehearing. Accordingly, they urge that dismissal of the murder conviction is the only just remedy.

To arrive at this conclusion, appellate counsel treat the appellant's situation as a two-act play where the scenes in the first act are so important that the play can never be revised to arrive at a different ending before the final curtain. We, on the other hand, view the circumstances as two one-act dramas that, while tangentially connected, need not reach the same conclusion.

Stated briefly, it is the appellant's position that his lawyers in the first trial so botched his defense that his lawyers in the second trial were prevented from adequately defending him. In their view the two trials are linked, and the trial tactics in the first which resulted in a rehearing had a prejudicial impact on the second.

■ For example, the appellant claims he was precluded from testifying in the second trial because of the "Life Story" his lawyers on his first trial had him prepare and give to potential defense psychiatric witnesses. Few decisions made during the course of a litigated trial are risk-free. Whether an accused takes the stand in a trial is a tactical decision where the danger of doing so is weighed against the benefit. Mansfield's decision whether to testify may not have been easy, but the choice was there. See State v. Lucas, 164 Ariz. 540, 794 P.2d 1353 (App.1990). The appellant did not take the stand at the rehearing. However, there could be any number of appropriate reasons, not related to the first trial, as to why the appellant did not testify. We need not speculate about them. United States v. Hurt, 9 U.S.C.M.A. 735, 27 C.M.R. 3 (1958); See United States v. Small, 48 C.M.R. 170 (A.F.C.M.R.1974).

■ Appellant's counsel also argue that the delay between the first and second trial prevented the appellant from obtaining additional psychiatric testimony. The record does not support this assertion. In addition to the psychiatrists who were potential defense witnesses at the first trial, the defense called expert witnesses who based their testimony solely on examinations of the appellant conducted subsequent to the first trial. There is no showing that passage of time between the two trials blotted out a substantial defense. Accord People

*v. Corona,* 80 Cal.App.3d 684, 145 Cal.Rptr. 894 (1978) (New trial ordered after a 7 year lapse because an insanity defense was available, but not raised. Accused initially convicted of killing 25 migratory workers).

■ Any rehearing can limit trial tactics. For example, an accused would be hard pressed to claim alibi in a second trial having relied on self-defense in the first. Likewise, any retrial permits the prosecution some insight into the likely strategy the accused will follow. There are several situations where an accused must disclose certain defenses before they can be asserted. The government must be informed whenever alibi is to be raised as a defense. R.C.M. 701(b)(1). If insanity is an issue, the prosecution is to be told. R.C.M. 701(b)(2). An accused may be examined by government psychiatrists where insanity is raised. *United States v. Parker,* 15 M.J. 146 (C.M.A.1983); *United States v. Babbidge,* 18 U.S.C.M.A. 327, 40 C.M.R. 39 (C.M.A.1969).

The appellant's two trials are not a continuum, but are separate and distinct hearings. The proper test is whether the lawyers at the appellant's second trial adequately defended him. *See Herman v. Butterworth,* 744 F.Supp. 1128 (S.D.Fla. 1989). We find that they did. The appellant is not entitled to a risk-free rehearing, but to a fair trial. His lawyers at the second trial were aggressive, innovative, and skillful. They used the available defense evidence to great potential advantage. That they were not successful does not detract from the quality of their representation. At the appellant's second trial, his Sixth Amendment right to effective representation was safeguarded to the fullest.

Appellate defense counsel seek to make the appellant's lawyers at the first trial surrogate counsel at the second. We decline to expand the law in this manner.

## ADMISSION OF "LIFE STORY"

As stated earlier the appellant, in preparation for his first trial, wrote a lengthy and detailed account of his relationship with Un–Cha and the events that led up to his meeting with Yang and what occurred during that meeting. This "Life Story" contained incriminatory statements by the appellant regarding Yang's death. At the second trial, this statement was used by the defense in direct examination of expert witnesses, Doctors Vosburg, Strefling, and Coburn, all of whom testified the appellant lacked the substantial capacity to conform his conduct to the requirements of the law at the time of the offense.

In rebuttal, the prosecution offered the entire statement as evidence tending to show that the appellant killed Yang. They argued that since the defense based a sizable portion of its direct examination of expert witnesses on information contained in the document, the members were entitled to consider the entire statement. *See* Mil. R.Evid. 801(d)(2); *see generally United States v. Lonetree,* 31 M.J. 849 (N.M.C.M.R.1990). They also urged that the statement was clearly voluntary within the meaning of Mil.R.Evid. 304. The trial judge admitted the statement.

■ Evidence that is not admissible in the prosecution's case-in-chief may become so by the tactics used by the defense. The military judge has broad discretion as to what evidence is to be admitted or excluded in rebuttal. *United States v. Rodriguez,* 28 M.J. 1016 (A.F.C.M.R.1989), *aff'd* 31 M.J. 150 (C.M.A.1990).

The appellant challenges his statement's admissibility on two grounds: 1) His expert witnesses only "considered" the statement but did not "rely" on it arriving at a conclusion as to his mental state; and 2) No foundation was established for its admission.

■ As to the first objection, appellate counsel are arguing semantics. It is clear that defense psychiatrists used the statement in reaching a diagnosis. Regarding the second objection, the trial defense counsel stated numerous times during direct examination of defense witnesses that Mansfield wrote the statement. Defense witnesses also testified they were given the statement by the appellant's counsel. Further, Mansfield acknowledged to at least two psychiatrists that he wrote

the account. Finally, the document itself contains information that only the appellant would know. All of these factors are strong circumstantial evidence of the document's authenticity. *Accord United States v. Cook,* 794 F.2d 561 (10th Cir. 1986).

■ However, we need not decide this issue solely on the objections raised by trial defense counsel and assertion to us by appellate counsel. Assuming, *arguendo,* that the trial judge erred in admitting the statement, we see no prejudice to the appellant. The question of who killed Yang was not contested by the defense trial team. In their opening statement, and before the challenged statement was admitted, the defense conceded that the appellant killed the victim. Further, various defense witnesses (psychiatrists) were told to assume that the appellant caused Yang's death. Under these circumstances it is difficult to hold that the admission of the appellant's "Life Story" resulted in prejudicial error.

### DENIAL OF MISTRIAL MOTION

■ During the government's rebuttal, Doctor Baser, a sanity board member, testified that the appellant was mentally responsible at the time of the offense. Doctor Baser stated that he had read and considered the appellant's "Life Story" in reaching a conclusion as to his mental state. When asked by the trial counsel if he knew why Mansfield's narrative was created, he replied:

> My understanding is that there was another document. In the course of my evaluation, the accused handed me *a long handwritten document of his confession,* as well as his description of the circumstances (emphasis added).

This answer is non-responsive and the witness inadvertently referred to a document not under discussion. Defense counsel objected to the answer and requested a mistrial maintaining that the disclosure created an impression that the witness had personal knowledge about the appellant's "Life Story," and the existence of a second document. Further, the court-members would expect answers to matters that could not be appropriately answered.

The trial judge denied the appellant's mistrial motion, and gave the following instruction:

> Members of the court, ... I want to give you an instruction. The witness referred to some sort of confession or admission handed to him by the accused at the time of the original sanity evaluation by this witness' sanity board.
>
> The court is instructed that nothing that was given to the witness during the interviews by this witness constituted a confession by the accused, and no inference to that effect should be drawn from the statement by this witness.

The defense considered the instruction inadequate, and claimed the error was "irremediable".

The decision to declare a mistrial rests within the sound discretion of the trial judge. The preferred remedy for curing error caused by members hearing inadmissible evidence is a curative instruction, so long as the curative instruction avoids prejudice to the accused. *United States v. Evans,* 27 M.J. 34 (C.M.A.1988), *cert. denied* 488 U.S. 1011, 109 S.Ct. 797, 102 L.Ed.2d 788 (1989); *United States v. Rebuck,* 16 M.J. 555 (A.F.C.M.R.1983), *pet. denied* 17 M.J. 52 (C.M.A.1984). Any error brought about by Doctor Baser's nonresponsive answer was harmless in light of the defense evidence already before the court. *Accord United States v. Bledsoe,* 26 M.J. 97 (C.M.A.1988). The members were aware of the "Life Story" through the testimony of numerous defense witnesses. Further, while the term "confession" denotes a high degree of culpability, the defense had earlier conceded that the appellant had caused the victim's death. These circumstances, plus the curative instruction, convince us that the trial judge did not abuse his discretion in denying the mistrial motion.

### KNOWLEDGE OF PRIOR TRIAL

■ At the government's request, the trial judge gave the following caution-

ary instruction at the beginning of the trial:

> The accused has been tried before. You should not concern yourself with this fact. Your verdict must be based solely on the evidence in the present trial, in accordance with the court's instructions.

This instruction was taken verbatim from the pattern instruction guide for federal judges. *See* Devitt & Blackmar, *Federal Jury Practice & Instructions*, section 10.-04, (3d ed. 1984).

Appellate defense counsel argue that this instruction together with the trial judge allowing the prosecution to call witnesses whose testimony directly or inferentially established that the appellant had previously been convicted of the same charge, denied the appellant a fair trial. They claim that the judge's actions effectively diluted the presumption of innocence to which every accused is entitled.

We find no fault with the challenged instruction. *United States v. Hykel*, 461 F.2d 721 (3d Cir.1972); *Carsey v. United States*, 392 F.2d 810 (D.C.Cir.1967). The government is not limited in the second trial to the evidence that was presented in the first, but may offer any admissible evidence that will strengthen its case. *United States v. Gallagher*, 602 F.2d 1139 (3d Cir.1979); *United States v. Shotwell Manufacturing Co.*, 355 U.S. 233, 78 S.Ct. 245, 2 L.Ed.2d 234 (1957). It is not uncommon during a rehearing for a reference to be made to the previous trial. The instruction that was given accepted that this was likely, and sought to meet the problem head on. Court members are presumed to follow the instructions of the trial judge. *See United States v. Moreno*, 10 U.S.C.M.A. 406, 27 C.M.R. 480 (1959).

### APPELLANT'S VERACITY

■ In rebuttal, Doctor Resnick testified that studies have indicated that psychiatrists are no better than lay persons in determining when someone is telling the truth. He did state, however, that identifying faked mental illnesses was an area of special interest to him, and he had taught courses on the subject. With this background, the trial counsel asked the following question:

> Q: Sir, have you formed an opinion in this case as to the accused's veracity?
> A: Yes, I have.
> Q: And what is that, Sir.

Before the question was answered, the trial defense counsel objected, made a motion for mistrial and, in an out-of-court hearing, contended the government was attempting to use Dr. Resnick as a "truth telling machine." *See generally United States v. Clark*, 12 M.J. 978 (A.F.C.M.R.1982), *pet. denied* 13 M.J. 480 (C.M.A.1982). The trial judge sustained the objection but denied the mistrial motion.

Initially, the defense opposed giving a curative instruction, but subsequently agreed that "it may be less hurtful to give an instruction than to not give an instruction." Thereafter, the trial judge gave the following instruction:

> Mr. President and members of the court, I want to instruct the court that it is solely the purview of you members of the court to determine the veracity of evidence brought before you and other matters called to your attention.
> No witness, whether an expert or not is qualified to determine as a matter of expertise or experience whether someone is or is not telling the truth. All they can do is express an opinion as to whether they think a person is or is not responding truthfully.
> You and you alone must make the final determination of whether or not a witness or a party is to be believed.

Appellate defense counsel claim that the "error was such that it was beyond fixing," and the above instruction only made it worse. Thus, they contend the trial judge erred in not granting the mistrial.

In evaluating the judge's ruling it must be remembered that the question was never answered. Further, the thrust of the question was toward the witnesses' expertise in identifying persons who feign mental illnesses, and not toward the appellant's general truthfulness. Later in the trial, the government offered evidence suggest-

ing that the appellant had attempted to fake a mental illness.

As we stated earlier, the decision to grant a mistrial lies with the sound discretion of the trial judge. Here he did not abuse that discretion, and his curative instruction was the proper remedy. *Evans*, 27 M.J. at 39.

## JURISDICTION

The appellant argues on appeal as he did at trial that the Air Force lacks jurisdiction over him or the offense. He claims he was in Korea "... solely on a private matter, traveling on a tourist passport." He was, according to him, "a private citizen on a private errand." Thus, there was no official connection between himself, the victim, and the United States. Under these circumstances, he contends he is a private citizen and cannot be "prosecuted by any arm of the United States" for an offense taking place in a foreign country.

This assigned error need not detain us long. In *Solorio v. United States*, 483 U.S. 435, 107 S.Ct. 2924, 97 L.Ed.2d 364 (1987), the Supreme Court held that court-martial jurisdiction rests on the military status of the offender and not on the nature of the offense. Even under pre-*Solorio* precedents, court-martial jurisdiction has been upheld over a servicemember who committed a crime in a foreign country where he was not stationed, but was visiting in an authorized absence status. *See e.g., United States v. Newvine*, 23 U.S.C.M.A. 208, 48 C.M.R. 960 (1974). The assigned error is without merit.

## MANDATORY SENTENCE

Appellate counsel argue that a mandatory life sentence for premeditated murder is invalid because the element of premeditation is unconstitutionally vague. They argue that since the premeditation aspect of a killing can be met in the "flicker of an instant," the government can define premeditation in an unfettered and unrestrained fashion when trying to prove any homicide offense. This, according to appel-

late counsel, "is the ultimate manifestation of prosecutorial whim."

Appellate counsel contend that the original charges against the appellant did not support a charge of premeditated murder because, as the advice of the Staff Judge Advocate acknowledged "there were no witnesses to the stabbing and · ... no forensic evidence linking the accused to the knife or the brutal killing." The vague definition of premeditation was therefore not enough to charge the appellant with premeditated murder with a mandatory sentence of life imprisonment upon conviction.

"Premeditation" is a term of art commonly employed and universally understood in the law of homicide. The military definition states:

> PREMEDITATION: A murder is not premeditated unless the thought of taking life was consciously conceived and the act or omission by which it was taken was intended. Premeditated murder is murder committed after the formation of a specific intent to kill someone and consideration of the act intended. *It is not necessary that the intention to kill have been entertained for any particular or considerable length of time. When a fixed purpose to kill has been deliberately formed, it is immaterial how soon afterwards it is put into execution.* The existence of premeditation may be inferred from the circumstances (emphasis added).

MCM 1984, Part IV, para 43c(2)(a). The military definition of "premeditation," with minor variations as to the language, is the same as that in civilian courts. *See generally Davis v. Wyrick*, 766 F.2d 1197 (8th Cir.1985); *United States v. Chagra*, 638 F.Supp. 1389 (W.D.Tex.1986), *aff'd* 807 F.2d 398 (5th Cir.1986); *cert. denied* 484 U.S. 832, 108 S.Ct. 106, 98 L.Ed.2d 66 (1988); *Hounshell v. State*, 61 Md.App. 381, 486 A.2d 798 (1985).

The concept of challenging a penal statute for "vagueness" rests on the constitutional principle that procedural due process requires fair notice and a proper standard for adjudication. *Landry v. Da-*

*ley,* 280 F.Supp. 938 (N.D.Ill.1968). Criminal statutes are presumed constitutionally valid, and the party attacking the constitutionality of a statute has the burden of proving otherwise. *See People v. Revello,* 735 P.2d 487 (Colo.1987). Here, appellate counsel offer only a generalized claim that the element of premeditation is "unconstitutionally vague"—they offer no authority and little discussion to support the assigned error.

▪▪▪ The "vagueness" test is not an exercise in semantics, but a pragmatic test to ensure fairness. The military case law as to what constitutes "premeditation," and what that term means, is so well-established that it prevents discriminatory enforcement by the government, the trial court, and the factfinders. *See United States v. Teeter,* 16 M.J. 68 (C.M.A.1983); *United States v. Matthews,* 16 M.J. 354 (C.M.A.1983); *United States v. Gay,* 16 M.J. 586 (A.F.C.M.R.1983); *aff'd* 18 M.J. 104 (C.M.A.1984). We reject the appellant's claim that the element of premeditation as defined by military law is unconstitutionally vague. *Accord United States v. Cooper,* 754 F.Supp. 617 (N.D.Ill.1990).

## LEADING QUESTIONS

Appellate counsel claim that Mansfield was denied a fair trial because the trial judge refused to permit trial defense counsel to ask leading questions of Myong–Cha Stein on direct examination. The victim was the Stein family's landlord, and he lived in the same house with them. Mrs. Stein had been, at one time, intimately involved with him. The appellant argues that Myong–Cha Stein was an adverse witness and the trial judge's ruling effectively denied him the ability to develop a defense of self-defense.[1]

▪▪▪ Leading questions may be defined as those which suggest to the witness the desired answer, or which assume to be proved a fact which is not proved, or which by stating a material fact, permit an answer by a simple yes or no. The general rule is that counsel, with the exception of adverse witnesses, may not ask leading questions on direct examination of a witness. However, the rule and the exception are not absolute, and it is within the sound discretion of the trial judge to permit such questions. Mil.R.Evid. 611(c); *Ellis v. Chicago,* 667 F.2d 606 (7th Cir.1981); *United States v. O'Brien,* 618 F.2d 1234 (7th Cir. 1980).

▪▪▪ Appellate counsel assert that Mrs. Stein was called to establish that Yang loved his children, was contemptuous of Un–Cha Haney, had violent propensities, and was insulted about the appellant's attempt to return his children to Un–Cha. All of this was supposedly in support of the defense theory of self-defense.

In almost 20 pages of direct examination only three trial counsel leading question objections were sustained. Further, it doesn't appear that these sustained objections hampered the defense's ability to elicit the desired testimony from Mrs. Stein. Mrs. Stein's testimony established those facts the defense wished to establish concerning the appellant's self-defense theory. We hold the trial judge did not abuse his discretion.

## PRIOR TESTIMONY

▪▪▪ The appellant claims that the trial judge erred in admitting, at his second trial over defense objection, the former testimony of Sim Sang–Kuk and Yi Chong–Kwan which was taken at his first trial. In support of this claimed error, appellate defense counsel remind us that Mansfield was granted a new trial because he was denied effective representation at his first trial.

We agree that the trial judge erred. Before testimony taken at a prior trial can be used, there is a requirement the accused be adequately represented at the former trial. *United States v. Vanderpool,* 15 C.M.R. 609 (A.F.B.R.1953). On certification of a similar issue by The Judge Advocate General of the Air Force to the Court of Military Appeals, Judge Brosman, wrote:

---

1. It was uncontested at trial that the victim died as the result of a single stab wound in the back.

[I]t would be inconsistent for us to agree that the accused was somehow denied adequate legal representation at the first trial and yet hold the testimony given at that proceeding to be admissible to ground a conviction at the second over the objection of the accused. On the contrary, we think that there is no logical escape from the conclusion that the former testimony ... was inadmissible, and that the objection by the defense to its introduction would have been well taken.

*United States v. Vanderpool,* 4 U.S.C.M.A. 561, 567, 16 C.M.R. 135, 141 (1954).

■ We have examined the record to see if the appellant was harmed. Sim Sang–Kuk is a bellman at the Hamilton Hotel. His former testimony established that he and Mansfield became drinking companions. During the course of their acquaintance, the appellant indicated to Sim that his "wife" was in a wheelchair, and her ex-husband was the reason for her condition. The appellant stated he was in Korea to get "revenge" against the ex-husband.

All of Sim's former testimony was before the court through the testimony of other witnesses. Additionally, some of Sim's testimony supported the defense theory that the appellant was not mentally responsible at the time of the offense. For example, Sim stated, at times, he thought the appellant acted like an "insane person."

Yi Chong–Kwan owns a rice store near the Song–Tan train station. He testified he saw an American fitting the appellant's description making a phone call from a booth near his shop. His testimony established that the appellant was in the area where Yang's body was found before the killing took place.

The same fact was also established by other witnesses in appellant second trial. Un–Cha's daughter, Sabina, testified she saw the appellant in the alley near Yang's house, and the appellant acted as if he did not know her. Further, Un–Cha's son, Michael, recognized the appellant's voice when he called the Stein residence and asked for Yang. Both incidents involving Un–Cha's children occurred a few hours before Yang was found dead.

Further, the defense did not deny that the appellant was in the alley with Yang and was "... the physical agent of the death of Mr. Yang." They acknowledged that in their opening statement. They defended on the appellant's lack of mental responsibility at the time of the offense and he had acted in self-defense when he killed Yang. The defense stipulated that the appellant met Yang in the alley on 3 February 1984 sometime between 2100 and 2200.

We are convinced that the erroneous admission of the prior testimony of these two witnesses was harmless error as there is other competent evidence of record by other witnesses establishing the same facts. Accordingly, it was collateral and cumulative information that had no reasonable impact on the court. *United States v. Quigley,* 44 C.M.R. 718 (N.B.R.1971); *See United States v. Finch,* 22 C.M.R. 698 (N.B.R.1956).

## PARTIAL MENTAL RESPONSIBILITY

■ Prior to argument on findings, the trial judge, without objection by the defense, gave the members the pattern instruction on partial mental responsibility found in Department of the Army Pamphlet 27–9 (Feb 85), *Military Judges' Benchbook,* paragraph 6–5. *See also Ellis v. Jacob,* 26 M.J. 90 (C.M.A.1988).

On appeal appellate counsel claim the unchallenged instruction was flawed in that it "omitted any reference to the fact that the accused may have been sane." In their view, this omission may have allowed the members to conclude that the defenses of mental responsibility and partial mental responsibility were mutually exclusive.

We disagree and hold that the instruction given by the trial judge correctly states the law in this area. *See generally United States v. Tarver,* 29 M.J. 605 (A.C.M.R.1989).

## SELF-DEFENSE EVIDENCE

■ Appellate defense maintain that the trial judge denied the appellant his

right to assert self-defense effectively by excluding "alley" references in the video deposition of Kong Su–Chim. The appellant sought to establish that the victim, Yang, was a violent man by offering evidence that Yang had attacked Kong with a knife in an "alley." Thus, there was a parallel between Yang's earlier use of a knife, and the altercation involving the appellant.

The record does not support the appellant's claim of error. Using leading questions on direct examination, trial defense counsel sought to have Kong admit that Yang had cut him on the ear with a knife in an "alley." Kong resisted defense counsel's urging that the attack took place in a "dark alley." Instead, he insisted the assault happened in a yard outside a tea room after both had been drinking. The incident apparently occurred sometime in early 1974. While Kong did not agree with defense counsel's suggestion that an "alley" was the locale of the assault, he did acknowledge that Yang was a violent person who would use a knife when provoked. This evidence supported the defense theory of self-defense. The trial judge did not abuse his discretion by deleting the additional "alley" references.

### STIPULATIONS

■ Appellate defense counsel argue the trial judge erred by failing to explain to the appellant the meaning and effect of three stipulations of fact and expected testimony. *See* R.C.M. 911(c); *see United States v. Cambridge*, 3 U.S.C.M.A. 377, 12 C.M.R. 133 (1953). The written brief on this assigned error devotes itself almost entirely to the premise that the stipulations agreed to by the appellant, trial defense counsel, and the prosecution were confusing to the court and should not have been admitted.

The three stipulations complained of were literally the last bit of evidence presented in this trial of almost five months. Each stipulation began with the preamble that the facts or testimony contained in the document was "stipulated and agreed [to] by and between the trial counsel and defense counsel with the express

consent of the accused." All in all, 17 stipulations were offered by the parties and admitted into evidence. In the last three the trial judge did not question the appellant as required by *Cambridge*.

This oversight did not prejudice the appellant. Where the stipulation is strictly procedural, or where, as here, the appellant has previously been advised about the same type of stipulation, the advice may be *curtailed or omitted*, in the judge's discretion. *United States v. Gonzalez*, 14 M.J. 501, 505 n. 8 (A.F.C.M.R.1982) (emphasis added).

We conclude the trial court did not err in admitting stipulations agreed to by all parties even though appellate counsel now considers them confusing and not helpful to the members.

### TEMPORARY ABSENCE OF LEAD COUNSEL

■ Appellate defense counsel argue that it was to the appellant's "substantial detriment" that during the initial Article 39(a) session the appellant was represented only by the assistant defense counsel and not the lead counsel.

In the out-of-court session on 29 June 1987, appellant specifically waived his lead counsel's presence. Additionally, the record indicates the appellant knew why lead counsel was unable to attend that 2 hour portion of the proceedings.

R.C.M. 805(c) states "As long as at least one qualified counsel for each party is present, other counsel for each party may be absent from a court-martial session." Thus, no error was created by the absence of lead counsel, and even assuming error, it was neither jurisdictional nor prejudicial. Further, appellate defense counsel has not directed our attention to any failure on the part of the assistant defense counsel to take any necessary action on behalf of the appellant. *United States v. Batts*, 3 M.J. 440 (C.M.A.1977).

### IMPROPER REBUTTAL AND CONSCIOUSNESS OF GUILT

Appellate defense contend the trial judge erred when he allowed the prosecution to

show that Mansfield had made 114 requests to use the law library at the United States Disciplinary Barracks (USDB). Citing *Bounds v. Smith*, 430 U.S. 817 (1977), the defense claims that since prisoners have a constitutional right of access to courts, the prosecution sought to penalize the appellant for exercising his right to use the law library. Appellate counsel analogize the evidence as commenting on an accused's right to plead not guilty or not to testify.

On the other hand, the government argued at trial that the testimony and documentary evidence was relevant as it explained how the appellant was able to educate himself on the defense of lack of mental responsibility.

▇▇▇▇ To be admissible, evidence must be relevant and not too remote in time so as to be probative. Mil.R.Evid. 401; *see also United States v. Teeter*, 16 M.J. 68 (1983). We are aware, of course, of the trial judge's broad discretion in admitting or excluding evidence under Mil.R.Evid. 403. *See United States v. Jackson*, 22 M.J. 604 (A.C.M.R.1986). However, here we conclude the trial court abused its discretion in admitting the appellant's many requests to use the law library. The possibility that the appellant may have used such visits to manufacture a defense is too remote to justify its admission as rebuttal evidence.

▇▇▇▇ While we find error, our examination of the record convinces us that the prejudicial impact of this evidence is nil. Two defense psychiatrists first broached this subject on direct and cross-examination. There was no objection by the defense at this time. Thus, the members were already aware of the appellant's use of the law library before the government offered more extensive evidence in rebuttal. Further, all aspects of the appellant's mental state were testified to by expert witnesses on both sides, and the ability of a patient to fabricate a mental disorder had already been discussed.

In a related assigned error, appellate defense counsel maintain the trial judge erred when he admitted evidence offered as "con-

sciousness of guilt." The testimony is of Technical Sergeant Smith, a friend of the appellant, who, after the first trial and through idle curiosity, asked the appellant if he had committed the offense. According to Smith, the appellant responded, "I can't say yes, and I can't say no, because there is going to be a round two."

Trial defense counsel's only objection was to the second half of the statement, "because there is going to be a round two." The defense contended that this testimony unnecessarily referenced the earlier trial and penalized the appellant for exercising his appellate rights. Thus, it posed the danger of "unfair prejudice, confusion of issues, and the risk of misleading the court-members."

▇▇▇▇ Admitting evidence tending to show the accused's consciousness of guilt is an accepted principle of military jurisprudence. *United States v. Borland*, 12 M.J. 855 (A.F.C.M.R.1981). It is within the trial judge's discretion whether to admit evidence offered as consciousness of guilt. Here, the judge erred in admitting such evidence. The appellant's statement in its entirety was so ambiguous that it could hardly be construed to show consciousness of guilt. At most it was the equivalent of saying "no comment." The reference to "round two" was innocuous because the hearing in which the statement was repeated was the "round two," i.e., a new trial.

Even though the testimony should have been ruled inadmissible, the impact, if any, was minor. The very ambiguity of the statement makes it unlikely the court-members attached any significance to it. Further, there was no reference to it by trial counsel in the final argument. The admission of the evidence was harmless error. *United States v. Peel*, 29 M.J. 235 (C.M.A. (1989)), *cert. denied*, 493 U.S. 1025, 110 S.Ct. 731, 107 L.Ed.2d 750 (1990).

### UNCHARGED MISCONDUCT

▇▇▇▇ The appellant's sister testified for the defense. On cross-examination she stated that the appellant visited her in Ari-

zona while she was in the hospital and that the appellant, while still on leave, then went to California for a short time.

Trial defense counsel objected to this disclosure on the basis of relevancy and that it was evidence of uncharged misconduct. Addressing the second ground first, this is not a situation involving uncharged misconduct. The Leave Request/Authorization Form does not require a military member to be at the leave address. He only must be able to be contacted at that leave address. *See* Form 988, Aug 86, *Leave Request/Authorization*, Part II, Section II, Item 6. Here the appellant, while in California, called his supervisor and gave him the phone number where he could be reached. Thus, the appellant was in full compliance with the governing regulation.

■ The trial judge initially agreed that the prosecution's argument that the appellant's actions in going to California indicated "manipulative behavior" was "stretching relevancy" to the limit. Accordingly, he sustained the defense objection. Later, he reversed himself, and admitted the evidence.

The trial judge should have adhered to his original ruling. We find it difficult to accept the prosecution's argument at trial that the appellant manipulated his sister's operation for the purpose of going to California, that such behavior is typical for the appellant, and that is relevant. Appellate government counsel expand this argument by claiming that "the evidence of the appellant's leave to visit his sister in Arizona is relevant because it supports [its] theory concerning mental responsibility by showing the appellant is the type of person who uses people and situations for his own ends." We also have difficulty accepting this basis for admission of the evidence. We hold the admitted evidence did not meet the relevancy test, and the trial judge erred by admitting it.

■ Having determined that, we conclude that admission of the evidence was harmless error. The appellant's claim that he was not mentally responsible at the time of the offense was examined on all sides by expert witnesses. The likelihood that the

members were prejudicially influenced by the fact that, while on leave in Arizona, the appellant also went to California for a short time is minimal.

## VOIR DIRE

Appellate defense counsel claim the appellant was denied due process of law when the trial judge, over defense objection, questioned the members during *voir dire* on an insanity defense that was not necessarily going to be raised.

This assigned error borders on the frivolous for several reasons. First, even a casual reading of our decision in *Mansfield I* would suggest that an insanity defense would be the key issue at any new trial. Trial defense counsel recognized this. As early as 5 June 1987, they requested the employment of three civilian psychiatrists, and in that request stated they expected that the lack of mental responsibility would be a major issue in the trial. The allied papers in this record are replete with correspondence from the defense, before the trial began, requesting the prosecution to arrange compensation and travel for the defense psychiatrists. These circumstances belie the appellant's later claim that "an insanity defense was not necessarily going to be raised."

Second, this court, and the Court of Military Appeals, along with other federal appellate courts, have long held that a trial judge is allowed the widest possible latitude in the manner and extent of the questioning on *voir dire*. *United States v. Robinson*, 475 F.2d 376 (D.C.Cir.1973); *United States v. Smith*, 27 M.J. 25 (C.M.A.1988); *United States v. Freeman*, 15 U.S.C.M.A. 126, 35 C.M.R. 98 (1964); *United States v. Nixon*, 30 M.J. 501 (A.F.C.M.R.1989), *pet. denied* 31 M.J. 435 (C.M.A.1990); *see also* Fed.R.Crim.P. 24(a).

■ Third, as we stated in *Nixon*, the main purpose of a *voir dire* is to uncover information so that challenges can be wisely exercised. As a result of the trial judge's questioning, seven members disclosed varying degrees of knowledge in the fields of psychiatry and psychology. One

member, later challenged by both the government and the defense, held a very low opinion of psychiatry and psychiatrists. Another member, also challenged by both sides, lacked only a thesis for a masters degree in psychology. This member was also well acquainted with DSM–III. The record clearly establishes that the questions asked by the trial judge resulted in useful information which the parties used in exercising both peremptory and challenges for cause.

 Finally, the appellant has not shown he was prejudiced in any manner by the judge's *voir dire* questioning—to the contrary, he was materially assisted by the judge's actions. The insanity issue was the major issue in the case, and it was appropriate for the trial court to raise this subject during *voir dire*. This assigned error is without merit.

### SPEEDY TRIAL

A total of 193 calendar days elapsed from 24 April 1987, the day this court set aside the appellant's murder conviction, and 2 November 1987, the first day that evidence went before the members. *See* R.C.M. 707(b)(3)(B).

In denying the appellant's motion to dismiss, the trial judge found that only 78 days of the total was accountable to the government through 28 September 1987, the date the appellant raised the speedy trial motion. The appellant claims the trial judge erred in calculating the number of days attributable to the government for speedy trial purposes under R.C.M. 707. He contends the speedy trial clock should have started on 24 April 1987, the day we set aside his conviction and not 13 May 1987, the date the trial judge concluded "the convening authority was notified of the final decision authorizing a rehearing." This period amounted to 18 days. Additionally, the appellant contends the government is accountable for 23 days it needed to complete the "mental examination process." Appellate defense counsel imply that the examination could have been accomplished quicker. *See generally United States v. Mahoney (Master Sergeant Jef-*

*frey M. Nourse, Real Party in Interest),* 28 M.J. 865 (A.F.C.M.R.1989), *pet. denied* 31 M.J. 484 (C.M.A.1990). The appellant also challenges the trial judge's accounting of the days attributable to the government after the speedy trial motion was denied. All-in-all, the appellant argues the government is responsible for *123 days* which is *3 days* over the 120–day speedy trial provision of R.C.M. 707(a). Accordingly, he argues he was denied a speedy trial and asks that his murder conviction be set aside. *See United States v. McFarlin,* 24 M.J. 631 (A.C.M.R.1987).

 One aspect of the appellant's speedy trial issue, and one which was not addressed by the parties at trial or by appellate counsel, is the effect of his right to further appeal on starting the speedy trial clock for a rehearing. Without considering the right to appeal, the rule is that, in the case of an appellate reversal, a rehearing must be held within 120 days of the date the convening authority is notified of the final decision authorizing a rehearing. *United States v. McFarlin, supra.* However, this rule does not apply in this case.

 Our decision in *Mansfield I,* while setting aside the appellant's conviction and ordering a rehearing, also contained a holding giving Mansfield the right to petition the Court of Military Appeals for review. In *Mansfield I,* in addition to our disposition of the ineffective assistance of counsel claim, we upheld a denial of another speedy trial motion. Thus, the appellant had the opportunity to petition the Court of Military Appeals on his original speedy trial claim of error, and if successful in his appeal, the charges would have been dismissed. In that event, no rehearing would have taken place.

R.C.M. 1203(d)(2)(A) gives an accused the right to petition the Court of Military Appeals within 60 days after notice of the lower court's ruling. *See United States v. Myers,* 28 M.J. 191 (C.M.A.1989). Appellant was notified of our decision in *Mansfield I* on 1 June 1987, and had until 30 July 1987, to petition the Court of Military Appeals on the speedy trial issue. The

appellant allowed the appeal period to expire without any action on his part.

Logic would suggest that the speedy trial clock on a rehearing should not start until the accused's appeal period has run or he has waived the right to appeal. Appellant had a statutory right to appeal our adverse ruling on the speedy trial issue, and had he done so within the 60-day period allowed him, jurisdiction of his case would have vested in the Court of Military Appeals, and no rehearing would be possible until that court acted on his petition. Article 67, UCMJ, 10 U.S.C. § 867; *see also Goodman v. Secretary of the Navy*, 21 U.S.C.M.A. 242, 45 C.M.R. 16 (1972).

Accepting the premise that the speedy trial clock on a rehearing does not start until an accused's appeal period has passed or he has waived the right to appeal, we conclude the appellant was brought to trial within the prescribed period, and therefore R.C.M. 707 was not violated. However, our decision to resolve this issue against the appellant does not rest on this conclusion alone. We have examined the trial judge's findings of fact, the controlling case law, and the record of trial. We find no basis to overturn his ruling denying the motion to dismiss.

## CHOICE OF COUNSEL

■ Appellate defense counsel argue the United States Air Force "improperly infringed" upon the appellant's Sixth Amendment right to choice of counsel when it was slow in disbursing his back pay when his first conviction was reversed.

In an affidavit submitted to this court over 2 years after the trial, the appellant claims he wanted a named civilian practitioner to represent him at his retrial in 1987. He stated the civilian attorney needed "an advance payment of $15,000 to $20,-000" to represent him. He further states he lacked available funds to meet this condition and intended to use his back pay to provide the retainer. The appellant also averred that repeated inquiries by him on

the status of his back pay went unanswered, and that it was not until February 1989 that the matter was resolved. All told, after the deduction of monies owed the government, the appellant received approximately $36,000.

The civilian counsel involved also submitted an affidavit acknowledging he was prepared to represent the appellant upon payment of the retainer previously mentioned. The attorney further indicated he told the appellant "that if the Air Force did not pay him his full back pay in time to arrange for my representation, that he [should] utilize that failure as a major issue in his appeal ... [should that be necessary]."

The appellant's desire to be represented by civilian counsel was never voiced at trial. In fact, on two separate occasions, the appellant, when questioned by the trial judge and told of his right to civilian counsel at his own expense, stated he was satisfied with his military counsel. No mention was made of the situation of which he now complains. The record establishes a clear and unequivocal waiver of the right to be represented by civilian counsel. *See generally United States v. Perez*, 18 U.S.C.M.A. 24, 39 C.M.R. 24 (1968).

## SENTENCE CREDIT

Appellate defense counsel maintain the appellant is entitled to 2 additional days credit toward his life imprisonment sentence. They argue the convening authority failed to credit him properly for the time spent in pretrial confinement.

■ Since Mansfield was sentenced to life imprisonment, it is tempting to apply the principle of *De Minimis Non Curat Lex* to this situation. However, since any confinement is the deprivation of personal freedom for a specified period, it is axiomatic that a confined person should be released once the confinement has been served.[2] *See United States v. Hilt*, 18 M.J. 604 (A.F.C.M.R.1984).

---

2. There is a tale told of a 17th Century English Justice who, while visiting one of His Majesty's prisons, asked to be placed in a pillory so he

might better understand the punishment he regularly adjudged. While there, the locks jammed

We choose to resolve any ambiguity in the trial judge's ruling in this area in favor of the appellant. Accordingly, the appellant is entitled to 2 days additional credit toward his period of confinement. Such credit is to be applied when it has a meaningful effect.

## CLEMENCY MATTERS

Appellate defense counsel direct our attention to the clemency recommendations submitted on the appellant's behalf and suggest that the trial transcript and allied papers fail to establish these recommendations were considered by the convening authority prior to taking action on the case. *See United States v. Craig*, 28 M.J. 321 (C.M.A.1989). The government has responded with an affidavit from the convening authority stating that he considered all of appellant's clemency matters prior to approving the sentence. *See United States v. Blanch*, 29 M.J. 672 (A.F.C.M.R.1989). We are satisfied the convening authority properly discharged his responsibilities under R.C.M. 1107(b)(3).

## POST–TRIAL DELAY

The convening authority took action on the record 423 days after the sentence was announced. Appellate defense counsel consider the intervening period an "inordinate and unreasonable delay." While conceding that the proceeding resulted in "a large record of trial," [3] the appellant argues the government mismanaged the post-trial typing and assembling of his transcript by choosing "to use inefficient procedures for case processing." The appellant claims he was prejudiced in four areas by the government's "snail-like" handling of his record of trial.

First, since his return to the USDB, his right to communicate with counsel has been interfered with. He specifically claims his correspondence with his appellate counsel has been opened and examined by unauthorized personnel. The appellant does not say how this was the result of post-trial processing, and we also see no connection.

Second, the appellant argues, that because of the delay, a convening authority other than the one he expected took action on his case. Again we see no prejudice as an accused *is not* entitled to a convening authority of his own choosing. What he is entitled to is an individualized, legally appropriate, and careful review of his sentence by the proper convening authority, and this is what he received. *See United States v. Fernandez*, 24 M.J. 77 (C.M.A.1987).

Third, that "between the post-trial delay and other government malfeasance," his restoration to duty and clemency consideration was delayed approximately 5 months. This claimed prejudice appears to be grasping at straws, since there is little likelihood that a prisoner serving a life sentence for premeditated murder would be restored to duty within 18 months of the announced sentence.

Fourth, the appellant maintains his medical problems have been "aggravated," and he incurred "a disproportionate tax liability" when he received a lump sum payment for his back pay. He further asserts that, although he is a "highly trained and skilled mechanic," he has been denied the opportunity of maintaining his technical expertise despite the fact that such opportunities ex-

and it was sometime before a locksmith released him.

Later, he was sitting in lawsuit where the plaintiff was seeking money damages for being kept in the pillory beyond the specified time of punishment. The barrister representing the Prison Keeper made light of the situation, saying "it was only for a few hours." The Justice, looking down from the bench, asked the barrister if he had ever been placed in the stocks. The barrister; with indignation, replied, "Of course not, milord." Whereon the Justice announced, "I have, and it is not the small thing you make of it."

3. In pleadings before this court, appellate defense counsel refer to the appellant's trial as the "most complicated and vexing case in Air Force history" with "no other case match[ing] it in size, number of errors, complexity, and the like." To now argue that the time needed to process such a transcript was excessive and unreasonable, appellate counsel appear to be seeking to run with the foxes and howl with the hounds.

ist at the USDB. He complains he has been assigned "to 'KP' and janitorial duties." Because of this prejudice, appellant asks that we affirm no more that 18 years confinement.

The government, on the other hand, argues that the time needed to assemble and forward the appellant's record was reasonable under the circumstances. They point out the distances involved between the trial judge, the court reporters, trial personnel, and the convening authority. The military judge's examination of the record resulted in approximately 60% of the pages being retyped. Further, it appears that the trial defense counsel misplaced three volumes of the record in a cupboard causing those volumes to be mailed at a later date.

■ The general thrust of the appellant's argument on this issue is that the post-trial processing could have been accomplished faster. This, of course, is not the standard. The administrative handling of any record of trial can be examined with 20–20 hindsight to identify areas where the processing could have been improved. The standard is not whether the post-trial processing could have been done sooner, but whether the time it did take was reasonable. Further, where the time taken is unreasonable, the appellant must show he has been prejudiced. Here, he has shown neither unreasonable delay or prejudice. In the situation before us, we conclude that the period required to assemble, read, and act on the appellant's record of trial was reasonable given the record's size and complexity. *United States v. Dunbar* 31 M.J. 70 (C.M.A.1990). *See United States v. Bourgette,* 27 M.J. 904 (A.F.C.M.R.1989), *pet. denied,* 28 M.J. 431 (C.M.A.1989).

## COMPLETENESS OF RECORD

Appellate defense counsel maintain that the appellant has been denied due process of law because the record of trial does not contain two video tapes that were admitted into evidence and viewed by the court members. This issue is moot as the video tapes have been deposited with this court and were available for appellate review.

## SUFFICIENCY OF EVIDENCE

■ Appellate defense counsel assert that Mansfield is not guilty of premeditated murder, by reason of a lack of mental responsibility. They state that much of the appellant's 32 volume record of trial "is nothing more than prosecutorial redundancy." Appellate counsel point out that the parties stipulated that on 3 February 1984, the appellant met Yang in an alley between 2100 and 2200. The stipulation goes on to say that Yang, whose body was discovered the next morning, died of a knife wound that severed a main blood vessel. Hence, as appellate defense counsel stated in their brief, "[I]t is fair to say that the appellant 'was indeed a physical agent of Mr. Yang's death.'"

It is apparent, as counsel admit, that Mansfield's mental state was the central issue at trial and a major point on appeal. Accordingly, counsel argue that the prosecution failed to prove, beyond a reasonable doubt, that the appellant possessed the substantial capacity to conform his conduct to the requirements of the law. They ask that we exercise our fact-finding powers under Article 66(c), UCMJ, 10 U.S.C. § 866(c), to hold that the appellant was not mentally responsible at the time of the offense, find appellant not guilty, and dismiss the charge and specification.

■ An accused's mental responsibility is a factual determination to be made by the court members under proper instructions. *United States v. Ott,* 26 M.J. 542 (A.F.C.M.R.1988), *pet. denied,* 27 M.J. 476 (C.M.A.1989); *United States v. Benedict,* 20 M.J. 939 (A.F.C.M.R.1985), *rev'd on other grnds,* 27 M.J. 253 (C.M.A.1989). At trial both sides offered extensive expert testimony about Mansfield's mental state. In the facts portion of this decision we related this testimony in some detail. Needless to say, it is in conflict. However, proof beyond a reasonable doubt does not mean that the evidence must be free from conflict. *United States v. Lips,* 22 M.J. 679 (A.F.C.M.R.1986).

■ The court members heard and evaluated this testimony along with the other

998

evidence in the case. They were convinced beyond a reasonable doubt of the appellant's guilt. Our statutory mandate requires us to review and weigh the evidence, and, making allowances for not having personally observed the witnesses, determine whether we are convinced of appellant's guilt beyond a reasonable doubt. Article 66(c), UCMJ; *United States v. Turner*, 25 M.J. 324 (C.M.A.1987). This was a lengthy and hard fought trial with both sides mustering all available evidence. We have examined the record of trial and, like the court below, are convinced beyond a reasonable doubt that the appellant is guilty of the offense alleged. *United States v. Neeley*, 21 M.J. 606 (A.F.C.M.R.1985), *aff'd* 25 M.J. 105 (C.M.A.1987), *cert. denied*, 484 U.S. 1011, 108 S.Ct. 710, 98 L.Ed.2d 660 (1988).

## SENTENCE APPROPRIATENESS

 Finally, appellate defense counsel suggest that a mandatory life sentence is "inappropriately severe" given the totality of appellant's circumstances. Appellate counsel portray the appellant as the victim of a "totally amoral" woman who controlled him like a marionette. Appellate counsel concede the appellant should be punished, but argue he does not deserve "life in prison."

The record establishes that the appellant killed the victim under a plan that was both carefully thought out and executed. It was not the result of sudden passion or provocation. And, just as "being in love is not a mental disease," neither is it a mitigating circumstance warranting amelioration of a life sentence for premeditated murder. We consider the imposition of a mandatory life sentence in this case to be entirely appropriate. For the reasons heretofore stated, the findings of guilty and the sentence are

AFFIRMED.

Chief Judge (Pro Tempore) MURDOCK concurs.

LEONARD, Senior Judge, dissenting:

Although I agree with a substantial portion of the majority's opinion, I must dissent from their analysis of the first two issues—ineffective assistance of counsel and the admission of the "Life Story."

In our prior review of this case, we were required to address the issue of ineffectiveness of counsel at appellant's first trial. Seeking adequate facts to decide the issue, we remanded the case for a *DuBay*-type evidentiary hearing. Our remanding order listed the issues on which we needed further information. The military judge who presided at the evidentiary hearing mistook our order as a warrant to compel surrender of any attorney-client communications between appellant and his original defense counsel. Among the communications he directed released was a detailed "Life Story" appellant wrote at his counsel's request. This hand-written statement was a complete confession of the circumstances surrounding the death of Yang.

At appellant's second trial, the military judge's rulings aggravated the erroneously compelled disclosure of the "Life Story" at the evidentiary hearing. Despite strenuous defense objections every step of the way, the military judge ruled the "Life Story" had to be disclosed to trial counsel, allowed trial counsel to read it to the court members under a pretense of cross-examination, and finally admitted it into evidence as appellant's confession.

I agree with appellant's contention that the compelled release of the "Life Story" and the rulings of the military judge at the second trial combined to deprive him of a fair trial. The only viable remedy is to set aside appellant's second conviction.

## FACTS

Mansfield prepared prosecution exhibit 65—"Life Story"—prior to his first trial at the request of one of his defense counsel. This counsel directed Mansfield to write a narrative statement detailing his recollection of the confrontation with Yang in Korea and the events leading up to it. In his own writing, Mansfield prepared a 58-page statement that counsel later copied in a 23-

page typed version.[4] Mansfield's lawyers treated both the handwritten and typed versions of this statement as "attorney work product" and kept them in their case files. The narrative statement told of efforts to hire a "hit man" in Korea and of the purchase of a knife by Mansfield before his meeting with Yang.

After Mansfield told his counsel the statement contained many falsities he added to try to convince them of his believability, counsel continued to press him for the true facts. Because they did not think they knew the truth, Mansfield's counsel advised him not to cooperate with the first sanity examination scheduled by the government at Yokota Air Base, Japan. However, the more counsel probed Mansfield, the more they became aware of his "preoccupations and obsessions." Finally, Mansfield's counsel requested a R.C.M. 706 mental examination and Doctor Vosburg convened a one-member board on 25 June 1984. He found Mansfield had a mental disorder that caused a diminished capacity to appreciate the criminality of the offense and an inability to conform his conduct to the requirements of the law. The defense did not provide Doctor Vosburg the "Life Story" at the time of the mental examination.

When Mansfield related another scenario his counsel believed closer to the truth, they prepared another statement of Mansfield's recollection of the confrontation with Yang and the events preceding it. They provided this second version to civilian psychiatrists examining Mansfield before his first trial. The second mental examination that occurred at Travis Air Force Base, California in September 1984 also received this version. Missing from the second version was any information about trying to hire a "hit man" or buying a knife before meeting with Yang. However, during his personal interview with a civilian psychiatrist, Doctor Coburn, Mansfield told about considering hiring a "hit man."

At Mansfield's first trial, his counsel planned a two-pronged defense. First, they intended to hold the prosecution to its burden of proving beyond a reasonable doubt that Mansfield had killed Yang. Second, they planned to show Mansfield's lack of mental responsibility. For the second prong, they had arranged for the testimony of Doctor Vosburg and Doctor Coburn. Both psychiatrists were prepared to testify that, at the time of the offense, Mansfield had a diminished capacity to appreciate the criminality of the alleged offense and lacked the capacity to conform his conduct to the requirements of the law.

After the trial began, but before the defense called their witnesses, they discovered, much to their surprise, that Doctor Coburn's interview notes mentioned Mansfield trying to hire a Korean "hit man" to kill Yang. Doctor Coburn was also surprised and informed the defense that he had not considered the "hit man" information in arriving at his opinion and preparing his report. However, after considering this information, he did not change his opinion.

At this point, Mansfield's counsel faced a real quandary. The military judge had already ruled that, if the defense called expert witnesses to testify about mental responsibility, the prosecution could discover any of Mansfield's statements used to arrive at the opinions. The defense team understood this to mean, if Coburn testified, the "hit man" statement would be given to the prosecution for use in their cross-examination. Fearing that this disclosure would devastate their case, Mansfield's counsel elected not to present a mental responsibility defense.

The appeal from the first trial raised an issue of ineffective assistance of counsel. Part of the claim of ineffectiveness relied upon the failure of Mansfield's counsel to present a mental responsibility defense. Our response to the claim of error was to order an evidentiary hearing to develop the facts related to the question of Mansfield's

4. The "Life Story" or first narrative statement by Mansfield is referred to as a 22–page or 25–page statement in our order and at various points during the evidentiary hearing and the second trial. An examination of the actual exhibit shows the typed version to be 23 pages.

lack of mental responsibility and ineffective assistance of counsel.

When the evidentiary hearing convened, the parties addressed the impact of the claim of ineffectiveness of counsel upon Mansfield's attorney-client privilege. Defense and government counsel agreed a waiver of the privilege would apply, but that evidence adduced at the hearing could only be used to resolve the issue of ineffective assistance of counsel as it related to the mental responsibility defense. The military judge ruled that communications between Mansfield and his prior counsel would be included in this limited use waiver. Mansfield's hearing defense counsel maintained a continuing objection to waiver of the attorney-client privilege for any other use and any waiver broader than necessary to resolve the issue.

The "Life Story," that became prosecution exhibit 65 at the second trial, came to light during the evidentiary hearing testimony of one of Mansfield's counsel from his first trial. Upon hearing the testimony, government counsel asked for the document. Before producing it, Mansfield's hearing counsel made it clear that he was providing the statement only because of the military judge's previous ruling finding waiver of such attorney-client communications. Counsel also restated his objection to any use of the document outside the scope of the evidentiary hearing ordered by the Court. The document that would later become prosecution exhibit 65 was marked as hearing exhibit 7 and provided to the government counsel. The second narrative version was marked as hearing exhibit 8. Both exhibits were appended to the record of the evidentiary hearing.

At Mansfield's second trial, his counsel contended the government could not use any evidence that they had gained access to, or become aware of, through the limited waiver of attorney-client privilege during the evidentiary hearing. He argued that Mansfield only waived the privilege to

show the ineffective assistance of his counsel at the first trial and use of this compelled evidence in the second trial would violate due process.

Both the government and the defense agreed that the evidence introduced at the evidentiary hearing warranted "limited use" protection. However, the parties' understanding of "limited use" was different. Mansfield's counsel argued that waiver of the attorney-client privilege only applied to prove ineffective assistance of counsel and the privilege still existed and barred use of the evidence for any other purpose. The government maintained that, once waived, the privilege no longer existed. In their view, only limited admissibility protection under Mil.R.Evid. 105 remained to protect the hearing evidence.

The question of the use of hearing exhibits 7 and 8 arose early in the second trial. Before trial, Mansfield's counsel requested discovery of mental examination reports of their client held by the government. *See* R.C.M. 701(a)(2)(B). In return, defense counsel gave the government reports of mental examinations of Mansfield prepared by the defense expert consultants. *See* R.C.M. 701(b)(4). However, trial counsel wanted more. They asked for any statements of Mansfield related to the reports of the defense experts. Although neither trial counsel participated in the first trial or the evidentiary hearing, they were aware of the existence of certain statements prepared by Mansfield, particularly the "Life Story," and wanted access to them.[5]

Defense counsel made a motion in limine to prevent trial counsel from getting either hearing exhibit 7 or 8. Defense counsel relied upon the ruling of the trial judge in Mansfield's first trial and an analogy with Mil.R.Evid. 302(c) which prohibits release of an accused's statements given during a R.C.M. 706 compulsory mental examination until the defense first introduces them into evidence.

---

5. The record does not reveal how the trial counsel became aware of Mansfield's statements. They could have read the evidentiary hearing transcript, been told of the statements by the hearing government counsel, or they could have read about them in our first opinion in this case.

Trial counsel opposed the motion in limine, taking a position that any statements made by Mansfield to the defense experts were incorporated into the experts' reports and were discoverable under R.C.M. 701(b)(4). In their view, no compulsion existed in the accused's interviews with defense experts, and Mil.R.Evid. 302 provisions designed to protect compelled statements were inapplicable.

In disposing of the motion in limine, the military judge limited government's access to defense experts before trial to the same extent as their access to the members of a sanity board. He ruled, once a defense expert appeared to testify, trial counsel could interview him about the basis for his opinion and review any statements, including those of the accused, the expert relied upon in forming his opinion.

At the close of the government's case, Mansfield's counsel stated they were proceeding with an insanity defense. They told the military judge they had provided the government Mansfield's statements to the defense experts and defense experts were available for interviews by the government. The court-martial then adjourned for a few days to allow the government an opportunity to examine the released documents and interview the defense experts.

When the court-martial reconvened, Mansfield's defense counsel objected to the government using hearing exhibits 7 and 8 to cross-examine defense experts or for rebuttal. The government opposed any limits on the use of hearing exhibit 7 or 8. The military judge agreed with the government and ruled that both hearing exhibit 7 and 8 could be used by the government in the cross-examination of the defense experts.

Trial counsel used the statements extensively in his cross-examination of the defense experts. Finally, after the last defense expert (Doctor Coburn) testified, trial counsel offered hearing exhibit 7 into evidence as prosecution exhibit 65. Over the objections of defense counsel, the military judge admitted the exhibit as a confession of appellant with no restrictions on its use.

## ANALYSIS AND THE LAW

On appeal to us, appellant argues he was denied a fair trial because of knowledge the government gained from the evidentiary hearing and the military judge's error in admitting prosecution exhibit 65.

The majority's approach to the asserted errors does not directly address four issues preserved for review and raised before us. These four issues are:

1. Whether the compelled release of hearing exhibit 7 at the evidentiary hearing: entitled the government to use this statement at appellant's second trial?

2. Whether appellant's defense counsel at his second trial waived any privilege or other protection entitled hearing exhibit 7?

3. Whether the government was properly permitted to use hearing exhibit 7 during cross-examination of the defense expert witnesses?

4. Whether prosecution exhibit 65 should have been admitted into evidence?

1. *Was the Government Allowed to Use Hearing Exhibit 7 Based on the Compelled Release at the Evidentiary Hearing?*

In my view, the government could not rely on the compelled release of hearing exhibit 7 at the evidentiary hearing as the basis for using this exhibit at Mansfield's second trial. Following the evidentiary hearing, the exhibit was still protected by either the attorney-client privilege or a limited use protection.

Appellant contends compelling him to waive the attorney-client privilege and release hearing exhibit 7 to the government at the evidentiary hearing gave the government an unfair advantage from that point forward. He argues the government's further prosecution of appellant's case was "tainted" by the government's knowledge of the statement. In support of their argument, they use an analogy to *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), which requires the government to show affirmatively that

none of its evidence at a subsequent prosecution is derived, directly or indirectly, from previously provided immunized testimony. *See United States v. Boyd,* 27 M.J. 82, 86 (C.M.A.1988).

I agree with the majority that the *Kastigar* analogy does not apply to appellant's situation. However, I do not agree a compelled waiver of the attorney-client privilege to prove ineffective assistance of counsel completely eliminates any privilege for the disclosed matter. When an erroneously compelled disclosure of attorney-client privileged statements occurs, the statements are not admissible against the holder of the privilege. Mil.R.Evid. 511(a). Therefore, the key to whether any privilege remained for appellant's statements is the correctness of the military judge's ruling at the evidentiary hearing.

On 5 March 1986, we issued an unpublished order for an evidentiary hearing to resolve factual questions regarding the defense of mental responsibility and appellant's claim of ineffective assistance of counsel. Our order required the military judge conducting the hearing to make specific findings of fact on the following questions:

> What was the extent of trial defense counsel's pretrial investigation of the facts and law relating to an insanity defense? Was the defense of insanity a "created" defense? If so, ... what role if any, did the appellant have in its creation? What role, if any, did the report of Doctor Vosburg play in preparing an insanity defense? During the course of counsel's investigation what if any information did they verify about a "hit man?" If so, when? Did counsel instruct appellant to withhold information from Doctor Coburn about a "hit man?" If so, when? Why did counsel wait until after the trial had begun to discuss this information with Doctor Coburn? Why was the 22 page statement by the appellant prepared? When? Why did counsel assert at trial that the military judge's discovery order regarding the 22 page statement changed the defense strategy? What, if any, advice was given by defense counsel concerning release of the

22 page statement at the trial? Why did counsel assert in their *Goode* response that the military judge's ruling regarding the statement was error? When and how did Doctor Coburn learn of the "hit man" information? What impact did this information have on his professional opinions?

The military judge conducting the hearing ruled that our order required the release of any attorney-client privileged communications bearing on the issues of ineffective assistance and the insanity defense. Further, he specifically required the defense to release both versions of appellant's written narrative statements. Appellant's counsel made it clear that he was only releasing appellant's statements because the military judge ordered their release. Counsel maintained that the only portions of these statements arguably relevant to the hearing were any references to use of a "hit man." He maintained a continuing objection to the release or use of attorney-client privileged communications any broader than necessary to resolve the specific issues this Court referred to the evidentiary hearing. Despite these objections, the military judge directed release of the entire text of both narrative statements to the government representative.

Our order of 5 March 1986 did not require Mansfield or his counsel to surrender any attorney-client privileged documents. Answers to all the questions asked in the order were available from the hearing testimony of appellant's original defense counsel, Doctor Vosburg, and Doctor Coburn without requiring release of any written statement Mansfield had made to his counsel. The military judge interpreted our order more broadly than necessary and erroneously compelled appellant to reveal the attorney-client communications contained in hearing exhibits 7 and 8. Absent a subsequent voluntary waiver, neither hearing exhibit 7 or 8 should have been admitted against Mansfield at his second trial. Mil.R.Evid. 511(a).

Further, even if the military judge's ruling were correct, the government agreed,

at both the evidentiary hearing and appellant's second trial, that privileged matters released at the hearing still had limited use protection under Mil.R.Evid. 105. The military judge at the second trial adopted this reasoning and ruled this limited use protection remained in effect at the second trial.

2. *Did Appellant's Counsel at the Second Trial Cause a Waiver of Any Protection Still Accorded Hearing Exhibit 7?*

The military judge at the second trial ruled that defense actions during the second trial waived any remaining protection accorded hearing exhibit 7. He found this waiver occurred because the defense expert witnesses had reviewed both versions of appellant's narrative statements. That ruling contradicted a previous ruling and, under the circumstances of this case, was in error.

Earlier, in response to defense counsel's motion in limine to prevent disclosure of hearing exhibits 7 and 8, the military judge had ruled the government's access to defense experts and members of mental examination boards would be the same. He ruled, prior to the defense electing to proceed with a mental responsibility defense, the prosecution could interview the defense experts to the same extent they could interview mental examination board members. He further held, once a defense expert appeared to testify, the government could reinterview the defense experts and review reports and statements of the accused *the expert relied upon in arriving at his opinion.* At the time of this ruling, the defense had not yet given notice under R.C.M. 705(b)(2) of an intent to rely upon the defense of lack of mental responsibility. Although such notice is normally required before beginning trial on the merits, the military judge had allowed the defense to postpone notice until the close of the government's case.

According to this ruling, appellant's statements were not available to the government until the witnesses appeared to testify and then only if the experts were relying upon the statements. The military judge's ruling in response to the motion in limine was correct with respect to government access to appellant's statements. Mil.R.Evid. 705 provides an expert may give opinion testimony and give his reasons for the opinion without prior disclosure of the underlying facts or data, unless the military judge requires otherwise. The rule further provides: "The expert may in any event be required to disclose the underlying facts or data on cross-examination."

The only incorrect aspect of the original ruling was with respect to allowing the government to interview the defense experts before the defense elected a mental responsibility defense.

Up until the point the defense experts identified their experts as potential witnesses for the mental responsibility defense, revealing appellant's statements to the civilian psychiatrists hired by the defense or to Doctor Vosburg certainly did not waive any protection accorded the statements. The civilian psychiatrists were defense consultants hired with the approval of the convening authority and Doctor Vosburg had conducted a mental examination under R.C.M. 706(b).

Expert consultants act as members of the defense team or defense representatives. *United States v. Turner,* 28 M.J. 487 (C.M.A.1989); *United States v. Langston,* 32 M.J. 894 (A.F.C.M.R.1991). Confidential communications by an accused or his attorney to such consultants will not waive the protection accorded such communications. *See United States v. Toledo,* 25 M.J. 270, 275 (C.M.A.1987), *cert. denied,* 488 U.S. 889, 109 S.Ct. 220, 102 L.Ed.2d 211 (1988), *aff'd on rehearing,* 26 M.J. 104 (C.M.A.1988); *Langston,* 32 M.J. at 896; *United States v. King,* 32 M.J. 709 (A.C.M.R.1991); Mil.R.Evid. 502(b)(3). As long as they are consultants for the defense, the experts may not be interviewed by the prosecution or be compelled to disclose privileged communications made to them by the accused or other members of the defense team. *Id.* If the defense consultants later become expert witnesses, they may be interviewed by the prosecution and cross-examined about the basis for any

opinion they may offer. *Turner,* 28 M.J. at 489; *Toledo,* 25 M.J. at 274 n. 2; Mil. R.Evid. 706(a); R.C.M. 703(d); Mil.R.Evid. 705.

Statements of an accused made to a member of a board conducting a mental examination under R.C.M. 706(b) are privileged. Mil.R.Evid. 302(a). This privilege continues until the accused first introduces into evidence the statements or derivative evidence. Mil.R.Evid. 302(b)(1). Further, the prosecution cannot obtain an accused's statements to a R.C.M. 706 mental examination board until the defense first offers such statements into evidence. Mil.R.Evid. 302(c). Government interviews with members of a mental examination board may not inquire into statements the accused made to the board unless the accused first offers such statements into evidence or voluntarily discloses them to the government. *United States v. Littlehales,* 19 M.J. 512 (A.F.C.M.R.1984); Mil.R.Evid. 302(c); R.C.M. 706(c)(5).

Despite the ruling's erroneous granting of early interviews of defense expert consultants, there is no evidence of record that it caused any prejudice to appellant. Because of the limitations on the extent of such interviews with the defense experts, it appears trial counsel did not interview the experts prior to the defense giving notice of a mental responsibility defense.

Unfortunately, prejudice did flow from the military judge's later abandonment of the other aspect of his motion in limine ruling. Forgetting that he had earlier ruled statements would not be discoverable unless expert witnesses had relied upon them, he erroneously held that the mere review of hearing exhibit 7 by defense expert witness waived any protection accorded the exhibit.

In arguing against such waiver, defense counsel asserted that they had no choice in allowing their experts to review the statements. Both Doctors Coburn and Vosburg were required to review both statements as part of their testimony at the evidentiary hearing. According to counsel, the defense also had no choice with respect to the other two psychiatrists, Doctors Beck and Stre-fling. After the military judge's ruling on the motion in limine, the defense felt they had to take reasonable precautions to prepare Doctors Beck and Strefling for possible cross-examination on the exhibit. However, defense counsel continued to strongly argue that none of the defense experts were relying on the statement as a basis of their opinions. In effect, the defense team was trying their best to stay within the parameters of the military judge's motion in limine ruling, still present a viable mental responsibility defense, and avoid the trial counsel's use of hearing exhibit 7. However, their strategy was to no avail when the military judge changed the rules.

The military judge should have stuck with his earlier ruling and allowed the defense an opportunity to show their expert witnesses' opinions did not rely on hearing exhibit 7. Repercussions of the military judge's changed views laid the basis for trial counsel's improper and devastating use of hearing exhibit 7 in cross-examination of defense expert witnesses.

### 3. Could the Trial Counsel Use the Narrative Statements to Cross-examine the Defense Psychiatrists?

In compliance with the military judge's rulings, defense counsel released both hearing exhibits 7 and 8 to trial counsel after notification of a mental responsibility defense and that the defense experts would testify in support of the defense. However, after the release, defense counsel strongly objected to trial counsel using the exhibits to cross-examine defense expert witnesses. The defense contended that the statements were still protected by the attorney-client privilege. They acknowledged defense experts had reviewed the statements, but contended the experts were not relying on them to form an opinion as to appellant's mental responsibility.

In response to this objection, the military judge erroneously ruled, as long as the defense experts had seen both narrative statements and any privilege with respect to them had been waived, trial counsel could use them in cross-examination.

The mere release of the narrative statements to trial counsel did not necessarily give him the authority to use the statements outside his interviews with the defense psychiatrists. His ability to use the statements in cross-examination depended upon the circumstances of each psychiatrist's access to the statement and the extent, if any, the expert relied upon the statement to form his opinion.

Doctors Beck, Coburn, and Strefling had no previous involvement with any mental examination ordered under R.C.M. 706(b). Neither Beck or Strefling were potential expert witnesses at the first trial and they did not testify at the evidentiary hearing. They reviewed both versions of the narrative statement to prepare them for expected cross-examination. Appellant related portions of the first narrative statement to Doctor Coburn during interviews in preparation for the first trial. Coburn also reviewed both versions during his testimony at the evidentiary hearing. None of the three testified that he relied upon either narrative statement as a basis for his opinion.

During Beck's direct examination, there was only one reference to hearing exhibit 7. Near the end of direct examination, after he had already expressed his opinion and the basis for it, defense counsel asked Doctor Beck four hypothetical questions based on facts similar to some portions of hearing exhibit 7.

In response to each question, Doctor Beck either explained how the posed hypothetical would support his opinion or that it did not change his opinion.

Cross-examination of Doctor Beck was extensive. After exploring the reasoning behind Doctor Beck's opinion, trial counsel began asking Doctor Beck about "an approximately 22–and–a–half page, single-spaced, legal size document—typed single-spaced, which was taken verbatim from some 58 pages of handwriting." When the witness stated he was not sure what was being referred to, the trial counsel replied: "I'll hand you one. It's titled, 'Life Story.'" Trial counsel continued with the following:

TC: And this, sir, is what we purport to be a statement by the accused that he had made originally to his defense counsel, in fact at that point in time?

Wit: Yes.

TC: Sir, you're under the impression, are you not, that this was in fact the accused's first version to the defense counsel at that time?

After Doctor Beck replied that he did not know the version or the order of the statement, trial counsel tried twice more to get him to agree that the document was Mansfield's first version of events.

Once everyone's attention was fully drawn to the document handed to Doctor Beck, trial counsel proceeded line by line, page by page through the statement. For every question, trial counsel read from the statement and then had Doctor Beck agree that those words were in fact in the statement. This procedure continued for 22 pages of record until trial counsel finally arrived at the last page of the statement. Other than the first question, there were no attempts to relate the questions to any portion of Doctor Beck's opinion. Trial counsel never asked Doctor Beck if the quoted portions of the statement affected his opinion.

Doctor Strefling was a military psychiatrist at the Fort Leavenworth, Kansas Disciplinary Barracks. His only reference to the statement during direct examination was after he had given his opinion and the basis for it. Defense counsel then asked if Strefling were aware of statements by appellant and whether he had considered them. He replied affirmatively.

The cross-examination of Doctor Strefling was not as extensive. Trial counsel made only one direct reference to either narrative statement and that reference only dealt with the nature of appellant's contacts with Un–Cha Haney before and while he was in Korea.

Doctor Coburn's direct examination briefly referred to the narrative statements. After he expressed his opinion, defense counsel asked about his familiarity with "statements attributed to Sergeant

Mansfield that have been referred to as Hearing Exhibits 7 and 8?" Defense counsel asked if he were aware that one of the statements referred to discussions about hiring someone to kill Yang and to the purchase of a knife that may have been used in the killing. He replied that he was, he had considered them, and they did not alter his opinion.

Doctor Coburn's cross-examination about the first version of the narrative statement was almost as extensive as Doctor Beck's. Some 18 pages of cross-examination ask about hearing exhibit 7 and whether Doctor Coburn was aware of specific quotes from the statement. Trial counsel asked the questions in the format of "Are you aware . . .?" Doctor Coburn was not asked if the statements formed any basis for his opinion or if consideration of them changed his opinion. With few exceptions, no attempt was made to relate the "Are you aware" questions to any portion of Doctor Coburn's opinion.

Doctor Vosburg reviewed both versions of the narrative statement during his testimony at the evidentiary hearing. The only reference to either statement during Doctor Vosburg's direct examination was the following:

Q. Sir have you had occasion to read a document that has been attributed to Sergeant Mansfield?

A. You mean the Exhibits 7 and 8?

Q. It's been called variously Exhibits 7 and 8, or Life Story.

A. Yes, I have.

Q. You read such a document?

A. Yes.

Q. And have you considered a—the impact of what's contained within that document in your diagnosis of the case?

A. Yes, I have.

Q. And what effect has that had upon you diagnosis and your opinions?

A. I've kept the same opinion.

Doctor Vosburg's cross-examination concerning the narrative statements was brief. Trial counsel asked him if he was aware of the 58 page handwritten "Life Story." He then asked about Vosburg's awareness of

references in the statement to discussions with a person in Korea to kill Yang for money and references to buying a knife before meeting with Yang. No references were made to the second version of the statement.

Mil.R.Evid. 703 allows an expert witness to base an opinion upon facts or data of the type reasonably relied upon by experts in the particular field of his expertise. The facts or data relied upon need not be admissible in evidence.

Although cross-examiners have great leeway to inquire into the basis of an expert's opinion, the right to do so is not unlimited.

First, the expert only has to disclose "the underlying facts or data" for his opinion. Mil.R.Evid. 705. The military judge recognized this when he originally ruled on the defense motion in limine to prevent trial counsel's discovery of the statements. In that ruling, he decided that the trial counsel could only discover the statements upon which a defense psychiatrist "relied in arriving at his decision."

Second, trial counsel cannot use cross-examination of an expert to "smuggle" hearsay or uncharged misconduct into a case. *See United States v. Cole*, 29 M.J. 873 (A.F.C.M.R.1989), *aff'd*, 31 M.J. 270 (C.M.A.1990); *United States v. Neeley*, 21 M.J. 606 (A.F.C.M.R.1985), *aff'd*, 25 M.J. 105 (C.M.A.1987).

In affirming *Neeley*, Judge Cox endorsed the recommendation of Saltzburg, Schinasi, and Schlueter to use Mil.R.Evid. 403 as the means to resolve the admissibility of evidence elicited as part of the basis for an expert's opinion under Mil.R.Evid. 703 and 705. *Neeley*, 25 M.J. at 107; S. Saltzburg, L. Schinasi, & D. Schlueter, *Military Rules of Evidence Manual* 595 (2d ed. 1986). Other federal courts considering the issue under Fed.R.Evid. 703 and 705 applied the balancing test of Fed.R.Evid. 403 to determine the admissibility of hearsay or uncharged misconduct as a basis for an expert's opinion. *See, e.g., United States v. Wright*, 783 F.2d 1091 (D.C.Cir.1986); *United States v. Gillis*, 773 F.2d 549 (4th Cir.1985).

To apply the balancing test under Mil. R.Evid. 403, the questions are: Is the proffered evidence relevant? If so, does the danger of unfair prejudice created by the testimony outweigh its probative value? *United States v. Wingart,* 27 M.J. 128 (C.M.A.1988); *Neeley,* 25 M.J. at 107. When performing the balancing test, the possible motives of counsel in eliciting the evidence may also be examined. *Cole,* 29 M.J. at 875; *Neeley,* 25 M.J. at 107.

The military judge in this case made two significant errors in ruling that trial counsel could use appellant's narrative statements to cross-examine the defense psychiatrists. First, he did not consider whether the opinions of the defense psychiatrists were even partially based on the statements. Second, he never performed a Mil. R.Evid. 403 balancing test. The record shows the only matters he considered before ruling were whether a privilege still protected the statements and whether the expert witnesses had reviewed the statements.

The military judge's ruling that mere review [6] of statements transforms such statements into a basis or "underlying facts or data" ignores the clear wording of Mil.R.Evid. 705. Under the facts of this case, forcing disclosure of the narrative statements and then allowing cross-examination on them really stretched the meaning of "underlying facts or data."

Further, when considering the admissibility of such highly prejudicial evidence, the military judge must not overlook the Mil. R.Evid. 403 balancing test. The information trial counsel sought to elicit through cross-examination on the narrative statements was certainly relevant. It concerned the story of the events leading up to the offense and the offense itself in appellant's own words. Portions of the statements were relevant to every element of the offense and the mental responsibility defense.

However, appellant's narrative statements were not the only source of this information. Nearly all of it was available to trial counsel through the testimony of witnesses and documents introduced by the prosecution. Trial counsel could have used the information in cross-examination without attributing it to a statement of appellant.

On the other side of the R.C.M. 403 balancing scale are the danger of unfair prejudice and the motives of trial counsel to elicit the evidence. Allowing trial counsel to use the appellant's own detailed handwritten communication to his attorneys to cross-examine the defense experts was fraught with potential for abuse by trial counsel and improper interpretation by the members. Further, the record shows this danger was not merely speculative. Without any pretense of challenging the validity of the opinion of the first defense expert, trial counsel used the cross-examination merely to read "the accused's first statement to his defense counsel" to the court members. Trial counsel was not using the statement to attack the credibility or the bases of the defense psychiatrist's opinion, but in an obvious attempt to put the statement before the members as an admission or confession. Such a practice was condemned in *United States v. Parker,* 15 M.J. 146, 153 (C.M.A.1983), as an improper use of a statement provided to examining psychiatrists.

Performing the balancing test the military judge failed to do, I find the danger of unfair prejudice clearly outweighs the probative value of allowing trial counsel to use appellant's narrative statements in cross-examination.

4. *Should Prosecution Exhibit 65 Have Been Admitted into Evidence?*

After the defense's evidence, trial counsel offered hearing exhibit 7 into evidence as prosecution exhibit 65. The government argued for admitting the statement on the

---

**6.** This was despite the defense argument that the defense experts' exposure to the statements was not at the choice of appellant or his counsel. Some of the experts reviewed the statements as a result of the evidentiary hearing and others were shown them because the judge's earlier rulings made cross-examination on them a good possibility. The defense always maintained the experts were not relying on the statements as a basis for their opinion.

disingenuous theory that, once the defense experts reviewed the statement and testified about it, the entire statement was admissible as a confession of appellant. The majority opinion noted this theory of completeness in their analysis concerning admission of the statement. For authentication of the statement, trial counsel asked the military judge to take judicial notice of the evidentiary hearing and this Court's decision in *Mansfield I*. Specifically, trial counsel relied on evidentiary hearing testimony of Mansfield's counsel from his first trial describing how he had Mansfield prepare the narrative for him. Trial counsel also argued that the limited use protection accorded the statement at the evidentiary hearing no longer existed after the defense voluntarily revealed it to their expert witnesses.

Mansfield's counsel strongly objected to the admission of prosecution exhibit 65. First, counsel again asserted that none of the defense experts relied upon the statement as a basis for their opinions.

Second, counsel maintained no foundation for the exhibit existed outside the evidentiary hearing. He argued that using the evidentiary hearing as the foundation was totally inappropriate. The evidentiary hearing was ordered to develop evidence necessary to determine the effectiveness of Mansfield's representation at his first trial. The statement offered as prosecution exhibit 65 was an attorney work product before the government's representative at the evidentiary hearing had convinced the hearing military judge that it was pertinent to the issue of ineffective representation. Now the government was using this compelled release of the statement at the evidentiary hearing as the basis to introduce the statement at trial as a confession of Mansfield.

The military judge admitted prosecution exhibit 65. In doing so, he found defense waiver of the limited use protection accorded the statement at the evidentiary hearing. He ruled that waiver occurred when defense experts testified they had reviewed and considered the statement in forming their opinions. He took judicial notice that the authentication of hearing exhibit 7 occurred at the evidentiary hearing. He found the statement was a confession or an admission by a party-opponent and was not hearsay, citing Mil.R.Evid. 801(d)(2)(A). Finally, he ruled that the relevance of the statement outweighed its potential prejudice.

The military judge's admission of prosecution exhibit 65 was erroneous for four reasons.

First, a theory of completeness offers no valid basis for admission of prosecution exhibit 65. In the recent case of *United States v. Cannon*, 33 M.J. 376 (C.M.A.1991), the Court considered admission of an entire statement under the "rule of completeness" of Mil.R.Evid. 106. The Court held this rule did not justify admission of a statement containing uncharged misconduct because a witness was impeached during cross-examination on a portion of that statement. *Cannon*, 33 M.J. at 383. *Cannon's* rationale applies to trial counsel's introduction of prosecution exhibit 65.

Second, admission of prosecution exhibit 65 during the government's rebuttal was improper. The exhibit did not qualify as rebuttal to the defense's case and admitting it as a confession of appellant was error.

Trial counsel offered prosecution exhibit 65 after the conclusion of the defense's evidence. Evidence presented by the prosecution at this stage of the trial would have to qualify as rebuttal evidence unless the trial judge granted leave to reopen the government's case in chief. *See* R.C.M. 913(c)(1). No such leave was requested or granted.

Testimony of the defense psychiatrists did not deny the existence of prosecution exhibit 65 or disagree with any of the quotes trial counsel attributed to it. In fact, as trial counsel read line by line from the narrative statement, the psychiatrists readily admitted that the statement contained every detail trial counsel read. Therefore, the exhibit did not "explain, repel, counteract, or disprove" any of the testimony of the defense experts and was

not proper rebuttal. *See United States v. Callara,* 21 M.J. 259 (C.M.A.1986); *United States v. Wirth,* 18 M.J. 214, 218 (C.M.A.1984); *United States v. Strong,* 17 M.J. 263, 266 (C.M.A.1984).

Third, the government could not introduce prosecution exhibit 65 as appellant's confession. Mansfield created prosecution exhibit 65 as an attorney-client communication in response to inquiries from his counsel. It was not intended to be "an acknowledgment of guilt" to agents of the government. *See* Mil.R.Evid. 304(c)(1). Any waiver of the attorney-client privilege or other protections arising out of the evidentiary hearing was limited.

The extent of such waiver should have been strictly restricted to the purposes provided by Mil.R.Evid. 705. Disclosure of the facts or data underlying an expert's opinion has a purpose under Mil.R.Evid. 705. That purpose is to allow the party achieving the disclosure to use the underlying facts or data in cross-examination to probe the validity of the opinion. *See* S. Saltzburg, *supra,* 605; S. Saltzburg & M. Martin, *Federal Rules of Evidence Manual* 118, 124 (vol. 2, 5th ed. 1990). Using an accused's statements provided to psychiatrists for consideration in forming an opinion does not make such statements admissible confessions. *Parker,* 15 M.J. at 153.

In *Parker,* the accused made statements during a compulsory mental examination ordered under paragraph 121, Manual for Courts–Martial (1969 rev). The defense subsequently provided the results of the mental examination, including the statements, to a civilian psychiatrist they had hired. At trial, the *Parker* trial counsel cross-examined the civilian psychiatrist on the statements, but never introduced them into evidence. On appeal, *Parker* maintained that trial counsel improperly used his compulsory statements to the mental examination to cross-examine the defense civilian expert.

The *Parker* court held, trial counsel had properly used the statements in the context of attacking the credibility of the civilian psychiatrist "rather than being an *obvious attempt to put the statements qua state-ments before the members as admissions or a confession.*" 15 M.J. at 153 (emphasis added). Further, in a footnote, the *Parker* Court specifically rejected a lower court decision holding an accused's statements to government psychiatrists, after advice of rights under Article 31, UCMJ, 10 U.S.C. § 831, admissible on the merits of the case. 15 M.J. at 152 n. 12; *United States v. Duwors,* 6 M.J. 957 (N.M.C.M.R.1979).

Although the "Life Story" did not originate in the protected atmosphere of a compelled mental examination, it came about in the protected status of an attorney-client communication. It was first revealed in its entirety to the government and Doctors Coburn and Vosburg under the "compelled" circumstances of the evidentiary hearing. Similarly, the defense contended that revealing it to Doctors Beck and Strefling was equally compelled by the prior circumstances of the case and the military judge's ruling. I would find the reasoning of the *Parker* case rejecting admitting an accused's statements to examining psychiatrists as an "admission" or "confession" controlling under the circumstances before us in appellant's case.

*Fourth,* the military judge's ruling allowing the admission of prosecution 65 overlooked an important aspect of the foundation for the exhibit. To authenticate the exhibit, he took judicial notice of Mansfield's prior counsel's testimony at the evidentiary hearing. Limited use of Mil. R.Evid. 511 protection for that testimony had not been waived. Unlike the statement itself, the former attorney's testimony had no role in the defense psychiatrists' preparation for expected cross-examination or in forming any part of their opinions. Further, there was no mention of the testimony during direct or cross-examination of the psychiatrists. This testimony was still protected and it could not be used at appellant's second trial by the prosecution or the military judge for any purpose. Without this testimony, inadequate foundation existed to establish prosecution exhibit 65 as a confession or admission of appellant.

## CONCLUSION

Contrary to the majority's opinion, I would find appellant was denied a fair trial by the military judge's rulings allowing the prosecution to use appellant's statement to his counsel for cross-examination and to introduce it as appellant's confession. I also would find this error to be highly prejudicial. Article 59(a), UCMJ, 10 U.S.C. § 859(a).

First, the statement went to the court members as an admission or confession of the accused without any limiting instruction. The military judge provided no explanation of its origin or purpose.

Second, it is obvious the government relied heavily on prosecution exhibit 65 to prove the facts of the killing of Yang and as critical evidence to dispel appellant's defense of lack of mental responsibility. Trial counsel made extensive use of it during closing argument to attack the credibility of the defense expert witnesses and to undermine their opinions. The government's own experts relied on it to support their opinions and to attack the opinions of the defense experts. Trial counsel also referred to it in closing argument to show proof of the elements of the offense, to counter arguments for a lesser included offense, and to attack the possible defenses of voluntary intoxication, self-defense, and partial or full mental responsibility.

The prejudice resulting from the erroneous use and admission of appellant's narrative statement requires setting aside of his conviction and sentence.