# UNITED STATES NAVY-MARINE CORPS
# COURT OF CRIMINAL APPEALS
# WASHINGTON, D.C.

**Before**
**J.A. FISCHER, B.T. PALMER, T.H. CAMPBELL**
Appellate Military Judges

**UNITED STATES OF AMERICA**

v.

**JEFFREY D. SAGER**
**AVIATION ORDNANCEMAN AIRMAN (E-3), U.S. NAVY**

**NMCCA 201400356**
**GENERAL COURT-MARTIAL**

**Sentence Adjudge:** 13 May 2014.
**Military Judge:** CDR John A. Maksym, JAGC, USN.
**Convening Authority:** Commander, U.S. Naval Forces Japan, Yokosuka, Japan.
**Force Judge Advocate's Recommendation:** CDR T.D. Stone, JAGC, USN.
**For Appellant:** LT David Warning, JAGC, USN.
**For Appellee:** LCDR Keith Lofland, JAGC, USN; LT Amy Freyermuth, JAGC, USN.

**29 December 2015**

---------------------------------------------------------
**OPINION OF THE COURT**
---------------------------------------------------------

**THIS OPINION DOES NOT SERVE AS BINDING PRECEDENT, BUT MAY BE CITED AS PERSUASIVE AUTHORITY UNDER NMCCA RULE OF PRACTICE AND PROCEDURE 18.2.**

FISCHER, Senior Judge:

A general court-martial, consisting of members with enlisted representation, convicted the appellant, contrary to his plea, of a single specification of abusive sexual contact, in violation of Article 120, Uniform Code of Military Justice.[1]

---

[1] The charge was alleged as the "Additional Charge," and is referenced as such throughout this opinion.

The convening authority (CA) approved the adjudged sentence of 24 months' confinement and a bad-conduct discharge.

The appellant asserts six assignments of error (AOE): (1) his charges were referred to a different court-martial than the one that adjudicated his case; (2) the CA systematically excluded E-5 personnel as potential members;[2] (3) the convictions are factually and legally insufficient; (4) the military judge abused his discretion by giving a curative instruction vice declaring a mistrial after he excluded the entire testimony of a Government witness heard by the members; (5) the Additional Charge was unconstitutionally vague, as applied in the appellant's case; and (6) the staff judge advocate (SJA) failed to comply with RULE FOR COURTS-MARTIAL 1106, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.) when making his recommendation to the CA. After carefully considering the record of trial and the parties' submissions, we conclude the findings and sentence are correct in law and fact, and there is no error materially prejudicial to the appellant's substantial rights. Arts. 59(a) and 66(c), UCMJ.

## Background

Airman (AN) TK and the appellant were assigned to the same Division aboard USS GEORGE WASHINGTON, homeported in Yokosuka, Japan.[3] On the evening of 8 March 2013, AN TK visited several bars with a group of shipmates in an area outside the base referred to as "the Honch."[4] AN TK testified that after visiting several bars, he left that group of friends and went to another nearby bar to charge his cellphone. AN TK understood the appellant would be at this bar and planned to use him as his "liberty buddy."[5] Once he arrived at the bar, AN TK found the appellant and joined him and his friends for the remainder of the evening.[6] This group of six Sailors left the bar around 2300

---

[2] In light of the affidavit submitted by the Rear Admiral Terry Kraft, USN, regarding the member selection process for the appellant's court-martial and in view of *United States v. Ward*, 74 M.J. 225 (C.A.A.F. 2015), we find no merit to this AOE.

[3] Record at 502.

[4] *Id.* at 505-06.

[5] *Id.* at 513. At the time of the incident, USS GEORGE WASHINGTON's policy required Sailors to have a "liberty buddy" when traveling off-base.

[6] *Id.* at 1033-34.

2

and walked to Fire Control Technician Second Class (FC2) DS's apartment where they all spent the night.[7]

Witnesses from the group described AN TK as exhibiting signs of intoxication while walking to the apartment.[8] In a statement to the Naval Criminal Investigative Service (NCIS), the appellant described AN TK's level of intoxication as "plastered." But he later testified that AN TK was stumbling and slurring his words "a little bit" while walking to the apartment.[9] Once inside the apartment, AN TK vomited into a bucket the appellant provided him.[10]

The accounts of AN TK and the appellant diverge at this point. According to AN TK's testimony, after vomiting he "passed out" on a futon in the living room and then awoke to the appellant manually stimulating his (AN TK's) penis.[11] His penis was erect after about 5-10 minutes of manual stimulation, and the appellant then performed oral sex on him until he ejaculated. He did not open his eyes during this encounter, but maintained that he knew it was the appellant because "[the appellant] was the only other one in the room."[12] In describing why he did not respond during the sexual encounter, AN TK stated he was frustrated, confused, and "wasn't really sure what was going on."[13] He described himself as "too intoxicated," and that he was unable to move, talk, or think of a way out of the encounter.[14] When the encounter was over, AN TK fell back asleep.[15]

In his testimony, the appellant provided a different account of the incident. He stated that after AN TK vomited, he

_____

[7] *Id.* at 1034-35.

[8] A Government expert witness estimated AN TK's blood alcohol content (BAC) peaked at approximately .226 on the night in question. *Id.* at 657.

[9] *Id.* at 1035, 1056; Prosecution Exhibit 16 at 1.

[10] *Id.* at 527, 1036, 1075.

[11] *Id.* at 528, 604.

[12] *Id.* at 529.

[13] *Id.* at 533.

[14] *Id.*

[15] *Id.* at 535.

and AN TK laid down on the futon together and discussed AN TK's problems with his girlfriend and the difficulty the appellant, a homosexual, had in a previous relationship with a heterosexual male.[16]  The appellant described this conversation as "intimate" and stated that at one point AN TK began crying, then rested his head on the appellant's chest.[17]  He interpreted the conversation and AN TK's actions as an invitation for sexual contact and put his hand on AN TK's stomach to "test the waters."[18]  When AN TK did not resist, the appellant moved his hand to AN TK's pants, pulled his penis out of his underwear, and began to manually stimulate it.[19]  After a short time AN TK's penis became erect and the appellant performed oral sex until AN TK ejaculated.[20]

The next morning, AN TK awoke after the appellant had left the apartment.[21]  AN TK testified that his penis was tucked into his waistband, his pants were undone, and he had ejaculated on his stomach.[22]  Sometime after leaving the apartment, AN TK called his mother.  Based in part on her advice, he decided to go to the hospital and report the incident.[23]

At the hospital, AN TK underwent a sexual assault examination and then was connected with an NCIS agent.[24]  At the request of NCIS Special Agent (SA) SC, AN TK participated in a "pretext" Facebook messenger conversation with the appellant.[25]  During this conversation the appellant initially stated he did not remember having a sexual encounter with AN TK.  Eventually, however, the appellant acknowledged the encounter, writing: "It was me it had to be I'm not lying when I say I really don't remember doing that to you . . . It's inexcusable and I will say

---

[16] *Id.* at 1037–38.

[17] *Id.*

[18] *Id.* at 1038.

[19] *Id.* at 1081.

[20] *Id.* at 1043.

[21] *Id.* at 535.

[22] *Id.* at 536.

[23] *Id.* at 546.

[24] *Id.* at 547.

[25] *Id.* at 549, 788.

4

I am so sorry . . . ."[26]  DNA testing identified AN TK's semen and the appellant's saliva from the crotch of AN TK's boxer shorts worn on the night in question.[27]

**Analysis**

*Constitutional Challenge to Article 120 as Applied*

We first address the appellant's contention that his conviction based on the element that AN TK was "otherwise unaware the sexual act was occurring" is unconstitutionally vague as applied in his case.

We review the constitutionality of statutes *de novo*. *United States v. Wright*, 53 M.J. 476, 478 (C.A.A.F. 2000).  Laws must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  Prior to prosecution, due process requires that a person have fair notice that an act is criminal. *United States v. Vaughan*, 58 M.J. 29, 31 (C.A.A.F. 2003).  Therefore, when "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application," it is unconstitutional.  *Connally v. General Construction Co.*, 269 U.S. 385, 391 (1926) (citation omitted).  In assessing a vagueness challenge, we must examine the statute "in light of the conduct with which the defendant is charged." *Parker v. Levy*, 417 U.S. 733, 757 (1974) (citation omitted).  "Criminal statutes are presumed constitutionally valid, and the party attacking the constitutionality of a statute has the burden of proving otherwise." *United States v. Mansfield*, 33 M.J. 972, 989 (A.F.C.M.R. 1991) (citation omitted), *aff'd*, 38 M.J. 415 (C.M.A. 1993).

The Specification of the Additional Charge is:

**Specification:** In that [appellant], on active duty, did, at or near [location], on or about 9 March 2013, touch the penis of [AN TK] with his hand when he knew or reasonably should have known that [AN TK] was asleep, unconscious, or otherwise unaware that the sexual contact was occurring,

---

[26] PE 14 at 22.

[27] Record at 708.

with an intent to arouse the sexual desires of either himself or [AN TK].

The findings work sheet presented to the members read as follows:

(b) Guilty **in that [the appellant] committed a sexual contact upon [AN TK] when [the appellant] (knew) (or) (reasonably should have known) that [AN TK] was (asleep), (unconscious), (or) (otherwise unaware) that the sexual act was occurring.**[28]

The military judge instructed the members that if they voted to convict they were required to both choose the Government theory under which they found guilt and reflect that choice on the findings worksheet by circling the applicable language contained in parentheses.

Following the military judge's instruction the members circled "reasonably should have known" and "otherwise unaware" on the findings worksheet for this specification. The appellant now argues that through this action the members rejected the Government theories that AN TK was asleep or unconscious at the time of the contact and the Government did not provide notice as to AN TK's physical state that rendered him "otherwise unaware" of the sexual act aside from being asleep or unconscious. Thus, the appellant contends the specification is unconstitutionally vague in his case. The appellant's attack is two pronged: (1) the phrase "otherwise unaware" did not provide the appellant sufficient notice of the prohibited conduct; and (2) the phrase "otherwise unaware" encourages arbitrary and discriminatory enforcement.

Our sister court in the Air Force (AFCCA) faced a similar issue in *United States v. Chero*, No. 38470, 2015 CCA LEXIS 168, unpublished op. (A.F.Ct.Crim.App. 28 Apr 2015). In that case the appellant was found guilty of violating Article 120(b)(2) and the specification stated he committed a sexual act upon a person who was "unconscious or otherwise unaware," but the evidence at trial showed the victim was asleep. On appeal, the appellant argued he was not on notice because the phrase "unconscious or otherwise unaware" omitted the term "asleep" and thus failed to provide notice. The AFCCA expressly rejected the appellant's argument, stating: "we do not find [the] omission to result in a fatal variance; asleep is just one example of how an

---

[28] Appellate Exhibit XXV.

6

individual may be 'otherwise unaware' and is not an alternative theory." *Id.* at *8-9 (citation omitted).[29]

So too here, we conclude that asleep or unconscious are examples of how an individual may be "otherwise unaware" and are not alternate theories of criminal liability. A plain reading of the phrase is that a person cannot engage in sexual contact with another person when he/she knows or reasonably should know that the recipient of the contact does not know it is happening. We find that, as applied to the appellant's case, Article 120(d) provided sufficient notice of the proscribed conduct and there is no risk of arbitrary and discriminatory enforcement. We also note the defense theory at trial was that AN TK was fully aware of the appellant's actions and the sexual encounter was either consensual or the appellant reasonably believed it was consensual.

*Factual and Legal Sufficiency*

The appellant also argues that his conviction was factually and legally insufficient. We review factual and legal sufficiency claims *de novo*. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for factual sufficiency is whether we are convinced of the appellant's guilt beyond a reasonable doubt, allowing for the fact that we did not personally observe the witnesses. *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). The test for legal sufficiency is whether any rational fact-finder could have found that the evidence met the essential elements of the charged offenses, viewing the evidence in a light most favorable to the Government. *Id.* at 324. Here, we find appellant's conviction both factually and legally sufficient.

Members convicted the appellant of one specification of abusive sexual contact. They found the appellant committed sexual contact upon AN TK by touching AN TK's penis when the appellant reasonably should have known that AN TK was otherwise unaware that the sexual act was occurring. In his testimony, the appellant admitted to the sexual contact and thus focuses his legal and factual insufficiency argument on the second element contending "there was no evidence that [AN] TK was 'otherwise unaware the sexual contact was occurring.'"[30]

---

[29] On 13 July 2015 the Court of Appeals for the Armed Forces granted Chero's Petition for Review on an unrelated AOE. *See United States v. Chero*, 2015 CAAF Lexis 682 (C.A.A.F. July 13, 2015).

[30] Appellant's Brief of 8 Jun 2015 at 19 (footnote omitted).

AN TK testified that when he awoke the appellant was already manually stimulating his penis.  The Government introduced substantial evidence that AN TK was heavily intoxicated when he returned to FC2 DS's apartment and laid on the futon.  Whether AN TK was asleep or unconscious due to alcohol consumption/exhaustion, or a combination of these things is only relevant as to whether the appellant reasonably should have known AN TK was "otherwise unaware" of the sexual contact. After carefully reviewing the entire record of trial, to include all testimony and admitted exhibits, and considering the evidence in the light most favorable to the prosecution, we are convinced that a reasonable fact-finder could have found all the essential elements beyond a reasonable doubt.  Furthermore, after weighing all the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced beyond a reasonable doubt that the appellant reasonably should have known AN TK was otherwise unware that the sexual act was occurring.  Thus, we find the appellant's conviction on the Additional Charge and specification is both legally and factually sufficient.

*Failure to Grant a Mistrial*

NCIS SA AR testified as a Government witness about her interrogation of the appellant.  The Government introduced the appellant's written statement into evidence during her direct examination.  The appellant had provided her greater detail about the sexual encounter than in an earlier statement to SA SC.  Specifically, in his earlier interrogation the appellant maintained that he did not remember the sexual encounter with AN TK, but said he must have been involved because he was on the futon with AN TK and no one else in the apartment that night would have done it.  But in his statement to SA AR, the appellant said that AN TK was lying on the appellant's chest, then rolled off before the appellant performed the sexual acts. The appellant also told SA AR that there was initially some kissing before the oral sex, but later admitted to SA AR that he lied about the kissing.  Finally, SA AR testified that the appellant told her that AN TK "mumbled a couple of times, during the [sexual activity]."

After both special agents testified, the Government began playing the NCIS video recording of the appellant's interrogations for the members.[31]  The trial counsel provided the

---

[31] Record at 815-18.

military judge a transcript of the video and based on his concerns from reading ahead, the military judge *sua sponte*, raised a suppression issue in an Article 39(a) session, before the members viewed the appellant's interrogation by SA AR. [32]

After identifying the issue for counsel, the military judge recessed the court-martial and gave the defense an opportunity to bring a suppression motion the following day.[33] While the members had heard SA AR's testimony, they had not seen the appellant's second written statement because, although it was admitted into evidence, it had not yet been published.[34]

The following day, trial defense counsel moved to suppress the appellant's statements to SA AR.[35] After considering the issue, the military judge found that SA AR "substantively violated the constitutionally based rights of the accused" by representing to the appellant that he would be compelled to take a polygraph examination and if found deceptive would face enhanced punishment.[36] The military judge then quashed (1) SA AR's testimony; (2) the appellant's written statement to SA AR; and (3) the recording of SA AR's interrogation of the appellant.[37]

After the ruling, the defense moved for a mistrial.[38] The military judge denied the motion, opting instead to give the following curative instruction:

> During the course of the government's case, you heard from Special Agent [AR] from the Naval Criminal Investigative Service, indicating that there was essentially a subsequent statement, both orally and written, made to her from [the appellant]. Listen very carefully to me.

---

[32] *Id.* at 887.

[33] *Id.* at 894.

[34] *Id.* at 871-86.

[35] *Id.* at 895.

[36] *Id.* at 909-10.

[37] *Id.* at 911.

[38] *Id.* at 917.

In your mind, as you go forward in this case, Special Agent [AR] never testified. She has no place in this trial. Her opinions, her recollections, her statements, her sworn testimony do not exist. I have quashed them in their entirety. Any reference to Special Agent [AR] does not exist. It has been eradicated, ab initio, as if it never had been said or done.

Special Agent [AR], it has come to the attention of this court, grossly violated the constitutional protections of [the appellant]. You can have no level of trust or reliability in anything said by [the appellant] to Special Agent [AR]. Thus, I have eradicated her testimony, the statement, and any reference to the statement, as though they never had been uttered.

Now, Special Agent [AR]'s inappropriateness and violative conduct was not known by the prosecutors in this courtroom. Accordingly, you are not to hold them personally responsible in being unethical attorneys going forward in this case. I assure you that is not the case.

But likewise, I assure you that Special Agent [AR]'s participation in this matter rendered the statement made to her grossly unreliable. Nothing in our system is more important than fairness and equity.

Because of its incredible unreliability, which is the fundamental makeup of any participation of Special Agent [AR] in this case, you can draw no conclusions whatsoever that anything you formerly heard about what [the appellant] said, because of certain prompting and threats made by Special Agent [AR], would be to any degree truthful in their foundation. Thus, you must completely, like I have judicially done, quash them and eradicate them from anywhere in your functioning medulla oblongata.

. . . .

[T]hat includes any reference to this statement, which no longer exists, or that witness, who no longer exists in this trial, by the government in their

10

opening statement.  So you literally subtract that
from their opening statement and go forward.[39]

The military judge gave the instruction immediately after
he ruled on the mistrial.[40]  He inquired with each member
individually to see if they could abide by his instruction and
all members replied in the affirmative.[41]  He then advised the
members a second time using similar language during findings
instructions before the members deliberated on the merits of the
case.[42]  The appellant argues the military judge abused his
discretion in denying the motion for a mistrial.  We disagree.

This court reviews a military judge's decision on whether
to grant a mistrial for abuse of discretion.  *United States v.
Dancy*, 38 M.J. 1, 6 (C.M.A. 1993).  "[A] mistrial is a drastic
remedy" and should be used "only to prevent a manifest injustice
against the accused."  *Id.* (citation and internal quotation
marks omitted).  A military judge's decision to grant a mistrial
"is appropriate only whenever circumstances arise that cast
substantial doubt upon the fairness or impartiality of the
trial."  *Id.* (citation and internal quotation marks omitted).
When the members have heard inadmissible evidence, a curative
instruction is the preferred remedy as opposed to declaring a
mistrial, so long as the curative instruction avoids prejudice
to the accused.  *United States v. Rushatz*, 31 M.J. 450, 456
(C.M.A. 1990).  Absent evidence to the contrary, this court may
presume that members follow a military judge's instructions.
*See United States v. Loving*, 41 M.J. 213, 235 (C.A.A.F. 1994);
*United States v. Holt*, 33 M.J. 400, 408 (C.M.A. 1991).

Here, the military judge did not abuse his discretion in
giving a curative instruction and denying the defense motion for
a mistrial.  The military judge gave a timely, specific, and
lengthy curative instruction, which ultimately advised the
members that they were required to "completely . . . quash [the
appellant's statement to SA AR and SA AR's testimony] and
eradicate them from anywhere in [their] functioning medulla
oblongata."[43]  He reviewed the curative instruction with each

---

[39] *Id.* at 933-34, 939.

[40] *Id.* at 932.

[41] *Id.* at 934-35.

[42] *Id.* at 1187, 1194.

[43] *Id.* at 934.

11

member individually.  Every member individually agreed to abide by his instruction.  The military judge expressed great confidence in the members' ability to follow his instructions.  He then went on to give the instruction a second time prior to findings.  At no time did the members see the appellant's written statement to SA AR or watch the video of SA AR's interrogation of the appellant.  Therefore, taking all of these circumstances into account, we find the curative instruction avoided prejudice to the accused and the military judge did not abuse his discretion in deciding to give a curative instruction vice declaring a mistrial.

Moreover, we find no reasonable possibility that the appellant suffered prejudice from the members having heard SA AR's inadmissible testimony.  The appellant gave substantially the same account of the incident in his testimony that SA AR previously indicated in her quashed testimony.

*Court-Martial Convening Orders*

On 5 September 2013, the CA referred a charge and two specifications, alleging the appellant violated Article 120, UCMJ, to a court-martial consisting of five officer members convened by General Court-Martial Convening Order (GCMCO) 2-13, signed that same day.  At the appellant's arraignment on 17 September 2013, the trial counsel stated the general court-martial was "convened by Commander, U.S. Naval Forces Japan, by [GCMCO] 2-13[.]"[44]  During this session, the appellant elected to be tried by a court-martial composed of members with enlisted representation.[45]

On 6 January 2014, the CA signed GCMCO 1-14.  It does not reference a specific case and lists five officers as members. The CA selected additional members and detailed them to the appellant's court-martial in modifications to GCMCO 1-14.  The members that ultimately heard the appellant's case were detailed in GCMCO 1A-14 and 1B-14.  The court-martial assembled on 15 January 2014.[46]  Prior to assembly, the appellant repeated his forum selection-a court composed of members with enlisted representation—and entered a plea of not guilty to the charge

---

[44] *Id*. at 2.

[45] *Id.* at 12.

[46] *Id.* at 108.

and specifications.[47]  Following the entry of pleas, the trial defense counsel moved to dismiss Specification 1 for failing to state an offense.[48]  The military judge heard argument on the issue, but did not immediately rule on the motion.[49]  Instead, he elected to proceed with the assembly of members and *voir dire*.[50]

Prior to the assembly of members, trial counsel stated:

> This court is convened by Commander, U.S. Naval Forces Japan, by General Court-Martial Convening Order 1-14, dated 6 January 2014, as amended by 1A-14, dated 9 January 2014, as amended by 1B-14, copies of which have been furnished to each member.  And 1B-14 is dated 14 January 2014, your honor.[51]

Contrary to her original jurisdictional statement, trial counsel pointed to GCMCO 1-14 as the original convening order. GCMCO 1-14, however, did not amend GCMCO 2-13, and GCMCO 2-13 was actually the convening order listed on the charge sheet.[52]

Regardless, none of the members listed in GCMCO 1-14 or 2-13 actually appeared at court on 15 January 2014.[53]  The CA issued GCMCOs 1A-14 and 1B-14 to detail members specifically for the appellant's court-martial, and those members assembled for the court-martial.[54]

After assembly, during *voir dire*, the military judge revisited and granted trial defense counsel's motion to dismiss Specification 1,[55] but without prejudice.  He also granted a

---

[47] *Id.* at 110.

[48] *Id.* at 111.

[49] *Id.* at 111-23.

[50] *Id.* at 127.

[51] *Id.*

[52] GCMCO 1-14; Charge Sheet dated 29 Aug 2013.

[53] Record at 127-28.

[54] GCMCO 1A-14 and GCMCO 1B-14; Record at 127-28, 130.

[55] *Id.* at 164.

13

recess to afford the Government time to correct the specification, and prefer and refer it anew.[56]

The Government accomplished these tasks that same day.  The CA referred the "Additional Charge" — one specification of abusive sexual contact — to a general court-martial convened by "[GCMCO] 2-13 dtd 5 Sep 13, as amended by [GCMCO] 1A-14 dtd 9 Jan 14, as amended by [GCMCO] 1B-14 dtd 14 Jan 14."[57]  The CA also provided the following special instructions: "to be tried in conjunction with the remaining charge and specification before the court convened by [GMCCO] 2-13 dtd 5 Sep 13, as amended by [GCMCO] 1A-14 dtd 9 Jan 14, as amended by [GCMCO] 1B-14 dtd 14 Jan 14."[58]

The court-martial reconvened on 21 January 2014.[59]  In light of the CA's special instruction to try the Additional Charge at the same proceeding as the remaining specification on the original charge sheet, the military judge reviewed with the appellant his ability to have two separate trials.[60]  After consulting with counsel, the appellant advised that he wanted to have one trial encompassing both the Charge and the Additional Charge.[61]  The Government arraigned the appellant on the Additional Charge, and he again elected to have a panel of members with enlisted representation decide his case.[62]

Prior to entry of the appellant's pleas on the Additional Charge, trial counsel described several corrections to the GCMCO:

> There are three dates that need to be changed in 1A-14 and we just need to reflect that the court was originally convened by 2-13 dated 5 September 2013, as opposed to 1-14 dated 6 January 2014.  So there are three separate paragraphs that have the wrong convening order number in them, and we would like them

---

[56] *Id.* at 164-67, 173.

[57] Charge sheet dated 15 Jan 2014.

[58] Charge sheet dated 15 Jan 2014; Record at 176.

[59] Record at 175.

[60] *Id.* at 176.

[61] *Id.* at 177.

[62] *Id.* at 189.

14

all to reflect Convening Order 2-13 dated 5 September 2013.[63]

. . . .

And then on the second Amending Order 1B-14, there are two places where 1-14 is referenced—excuse me, just one where 1-14 is referenced and that needs to be changed to 2-13 dated 5 September.[64]

. . . .

And then one final issue, sir, we discussed this last week. But the members that were listed on 2-13, we would ask that the court relieve those members. That was the—[65]

The military judge responded:

They stand relieved, so ordered.[66]

When asked by the military judge, the trial defense counsel raised no objections to the convening orders.[67]  The trial counsel then re-stated the jurisdictional data as follows:

[T]his general court-martial is convened by Commander, U.S. Naval Forces Japan by General Court-Martial Convening Order 2-13 dated 5 September 2013, as amended by order 1A-14 dated 9 January 2014, as amended by order 1B-14 dated 14 January 2014[.][68]

The military judge then announced that the court-martial was assembled, both with respect to the original charge and specification as well as the Additional Charge.[69]  The appellant

---

[63] *Id.* at 180.

[64] *Id.*

[65] *Id.* at 181.

[66] *Id.*

[67] *Id.* at 180-82.

[68] *Id.* at 184.

[69] *Id.* at 185.

entered a plea of not guilty to the Additional Charge and the parties moved forward with *voir dire*.[70]

The appellant now asserts his court-martial lacked jurisdiction to hear his case because the CA referred the charges to GCMCO 2-13—a panel that never assembled. We disagree with the appellant's contention.

When convening a court-martial, it is the CA's convening order which brings the court-martial into existence. *United States v. Glover*, 15 M.J. 419, 421 (C.M.A. 1983). Court-martial jurisdiction thus "depends upon a properly convened court, composed of qualified members chosen by a proper convening authority, and with charges properly referred." *United States v. Adams*, 66 M.J. 255, 258 (C.A.A.F. 2008) (citations omitted). The convening order itself, however, is "merely a formal recordation of [the CA's] expressed intent." *Glover*, 15 M.J. at 421. In those cases where the order itself, or conflicting orders, create doubt about the composition of the court-martial, the courts may attempt to give effect to the CA's intent, bearing in mind that "[a]dministrative errors in the drafting of a convening order are not necessarily fatal to jurisdiction." *Adams*, 66 M.J. at 259; *see also* United *States v. Padilla*, 5 C.M.R. 31 (C.M.A. 1952) ("[W]e should give weight to substance, and should not unduly emphasize matters of form"); *United States v. Mack*, 58 M.J. 413, 416 (C.A.A.F. 2003). Furthermore, our superior court has recognized that the process of excusing members and adding substitute members is an administrative vice jurisdictional matter. *Mack*, 58 M.J. at 417.

The appellant correctly identifies several convening order errors reflecting a lack of attention to proper court-martial procedure which cannot be condoned. The GCMCO modifications erroneously reference and relieve detailed members in GCMCO 1-14 vice GCMCO 2-13. However, those modifications, along with the special referral instructions for the Additional Charge, also clearly evince the CA's intent to relieve all the members in a standing panel and detail members, including enlisted members as required following the appellant's forum selection, solely for the appellant's court-martial.

The CA selected all of the members listed in General Court-Martial Amending Orders 1A-14 and 1B-14 and detailed them as the members for the appellant's trial. The parties agreed at trial that the CA intended for the appellant's panel of members to be

---

[70] *Id.* at 189.

16

comprised of the members listed in the amending orders.  The
appellant had the opportunity to *voir dire* all of the members
the CA detailed to the court-martial, and none of the members
listed in GCMCOs 2-13 or 1-14 were actually present on the day
of assembly.  In fact, the convening authority clarified his
intent when he referred the Additional Charge on 15 January 15,
stating that he referred the Additional Charge to "[GCMCO] 2-13
dtd 5 Sep 13, as amended by Order 1A-14 dtd 9 Jan 14, as amended
by Order 1B-14 dtd 14 Jan 14."

While these administrative errors reflect a less than ideal
practice, we find no prejudice to the appellant's substantial
rights and do not find jurisdictional error.  Nonetheless, the
appellant is entitled to a promulgating order that references
the correct convening orders and we direct the required
corrective action in our decretal paragraph. *United States v.
Crumpley*, 49 M.J. 538, 539 (N.M.Ct.Crim.App. 1998).

*SJA's Failure to Comment on Legal Error*

Following the court-martial, trial defense counsel
submitted two clemency requests—one on 30 June 2014 and another
on 12 September 2014.  Trial defense counsel raised several
legal issues in these requests.  Notably, she outlined arguments
asserting the military judge erred in denying a defense motion
for a mistrial and that Article 120 was unconstitutionally vague
as applied to the appellant.  The latter argument had been the
subject of a post-trial hearing wherein trial defense counsel
moved to dismiss the charge upon which the members convicted the
appellant.[71]  In a written ruling issued on 25 August 2014, the
military judge denied the defense motion.[72]

On 12 September 2014, the CA's SJA submitted the staff
judge advocate's recommendation (SJAR) to the CA.[73]  In the
recommendation, he enclosed both clemency letters from trial
defense counsel.[74]  The SJA advised that this allowed the CA to
review the raised legal errors in their entirety and "allowed

---

[71] Record at 1331.

[72] Military Judge's Order of 25 Aug 2015.

[73] The SJAR is dated 8 September 2014. However, the SJA clarified in his
affidavit that the date was a typographical error and that he actually
submitted the SJAR on 12 September 2014.  Government Motion to Attach
Affidavit of CDR Timothy Stone of 9 Apr 2015, filed on 10 Apr 2015.

[74] *Id.*

for a specific discussion on the issues" with the CA.[75]  In the text of his recommendation, he stated:

> The Defense raised multiple legal issues during the trial and post-trial; these issues are reiterated in enclosures (2) and (3).  Due to these perceived legal errors, Defense requests the finding of guilty be set aside, the charge and specification be dismissed, and the sentence be disapproved.[76]
>
> . . . .
>
> Having reviewed the results of trial and the record of trial, I recommend that you approve the sentence as adjudged and order the sentence executed in accordance with the UCMJ, MCM, and applicable regulations.[77]

The SJA advised that he made this recommendation after "determin[ing] Trial Defense Counsel's raised legal errors were without merit and did not require additional action by the CA."[78]

The CA received the SJAR.  Prior to approving the sentence as adjudged, he "considered the results of trial, the recommendation of the staff judge advocate, and all matters submitted by the defense and the accused in accordance with R.C.M. 1105 and 1106."[79]

The appellant asserts the SJA failed to provide an opinion concerning corrective action on the findings or sentence following the trial defense counsel's allegation of legal error under R.C.M 1105 and requests that we order a new SJAR and CA's action.  R.C.M. 1106(d)(4) provides that in response to trial defense counsel's allegation of legal error in a clemency request, the SJA is required to advise the CA "whether, in the staff judge advocate's opinion, corrective action on the findings or sentence should be taken[.]"  The advice the SJA provides to the CA, however, may simply "consist of a statement of agreement or disagreement" and does not require the SJA to

---

[75] *Id.*

[76] SJAR at 2.

[77] *Id.* at 3.

[78] Affidavit of CDR Timothy Stone at 3.

[79] General Court-Marital Order No. 3-14 of 19 Sep 14 at 3.

offer "an analysis or rationale."  R.C.M. 1106(d)(4).  *See also United States v. Hill*, 27 M.J. 293, 295-96 (C.M.A. 1988)

Here, the SJA enclosed both clemency requests in his SJAR, acknowledged the trial defense counsel's assertion of legal error in the body of his recommendation, discussed the issues with the CA, and advised the CA to approve the appellant's findings and sentence as adjudged.  While the SJA did not explicitly state in his SJAR that the legal errors were without merit, his recommendation does demonstrate that he neither agreed with the alleged legal errors nor believed corrective action was warranted.  Therefore, we find the SJAR complied with the requirements of R.C.M. 1106(d)(4).

Furthermore, we have already concluded the legal errors raised in the clemency petition did not warrant relief.  Thus, even if the SJAR did not comply with R.C.M. 1106(d)(4), there was no prejudice.  For these reasons, we decline to grant the requested relief.

## Conclusion

The findings and the sentence are correct in law and fact, and they are affirmed.  The supplemental Court-Martial Order will reflect that the court-martial was convened by Commander, U.S. Naval Forces Japan General Court-Martial Convening Order 2-13 of 5 September 2013, as amended by General Court-Martial Amending Order 1A-14 of 9 January 2014, as further amended by General Court-Martial Amending Order 1B-14 of 14 Jan 2014."

For the Court



R.H. TROIDL
Clerk of Court

19